CHATHAM CORPORATION, Plaintiff-Appellant, v. DANN INSURANCE, f/k/a Dann Brothers, Inc., Defendant (Zurich American Insurance Company, Defendant-Appellee).

First District (1st Division)    No. 1—03—0167

Opinion filed June 21, 2004.

354

George B. Collins and Christopher Bargione, both of Collins & Bargione, of Chicago, for appellant.

Edward M. Kay, James M. Hoey, Margaret Hupp-Fahey, and Melissa A. Murphy-Petros, all of Clausen Miller, P.C., of Chicago, for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

Plaintiff-appellant Chatham Corporation (Chatham) appeals from orders of the circuit court of Cook County granting summary judgment to defendant-appellee Zurich American Insurance Company (Zurich) as to Chatham's claims of breach of an insurance contract, waiver, and estoppel, and dismissing with prejudice Chatham's claim seeking a declaratory judgment of breach of contract.

Chatham, a company based in Chicago Heights, Illinois, was in the business of sterilizing medical products in Richmond, Virginia, through a subsidiary corporation known as Sterilization Services of Virginia, Inc. (SSV). SSV was an additional insured on a commercial property insurance package Chatham obtained from Zurich in 1996 with the assistance of Chatham's insurance broker, defendant Dann Insurance (Dann). Zurich and Dann were also located in Illinois. The Zurich policy covered loss of or damage to the SSV sterilization facility in Virginia and provided additional coverage for "Extra Expense," which was defined in the written contract as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to [covered] property." The policy indicated "you" was a reference to the named insured, Chatham, and its subsidiaries, including SSV, as additional insureds. The policy did not include definitions of the words "incur" or "necessary."

An equipment explosion on June 13, 1997, shut down the SSV facility for seven months. Zurich was immediately notified of the explosion and paid for the facility's reconstruction and about $1 million in "extra expenses" claimed by the insured, but it rejected about $1 million in additional "extra expenses." More specifically, during the restoration period, SSV could not sterilize the products of its main customer, a corporation now known as Maxxim Medical, Inc. (Maxxim). SSV's contract with Maxxim required SSV to find alternate sterilization facilities and to pay the cost of shipping Maxxim's unsterilized goods from SSV to the alternate facilities (Maxxim's "inbound freight"). SSV performed these contractual obligations, and Zurich reimbursed SSV for the resulting extra expenses. However, SSV was not contractually obligated to pay and never paid the costs of shipping Maxxim's sterilized products from the alternate facilities (Maxxim's "outbound freight") to Maxxim's customers. Zurich concluded that because SSV was not contractually required to pay Maxxim's outbound freight costs, those costs were not "necessary," and, therefore, not covered extra expenses. In addition, when SSV and Maxxim sued each other in federal district court in Richmond, Virginia, regarding their obligations under their product sterilization contract, the judge presid-

ing over their dispute also concluded that SSV was not contractually obligated to pay Maxxim's outbound freight expenses and rejected Maxxim's claim for those expenses. *Sterilization Services of Virginia v. Maxxim Medical, Inc.*, No. 3:01CV787, slip order at 18 (E.D. Va. June 24, 2002). The federal judge reasoned that the sterilization contract specified "that SSV's obligation [was] to pay the 'difference between the cost of *shipping to* [SSV's] Virginia Facility and the cost of *shipping to* any alternate facility,' " and that it would be improper to "read into that clause the phrase 'and from' because that is not the language the parties chose and that is not the obligation imposed on SSV by this contract." *Sterilization Services of Virginia*, slip order at 15. Further, a court "cannot make a new contract for the parties, but must construe the language as written." *Sterilization Services of Virginia*, slip order at 15. The federal judge pointed out that if SSV was actually required to reimburse Maxxim for all expenses incurred when SSV could not process product at its own facility, there would have been no reason to detail the specific expenses that SSV was obligated to pay under those circumstances. *Sterilization Services of Virginia*, slip order at 17. The judge also considered whether SSV was equitably estopped from raising its contractual defenses to Maxxim's suit, and determined there was "no evidence of any representation or misrepresentations made to Maxxim. Maxxim was merely advised to keep track of its costs." *Sterilization Services of Virginia*, slip order at 19.

In May 2000, Chatham filed a multicount complaint against Zurich in the circuit court of Cook County based on Zurich's refusal to pay SSV for the outbound freight costs incurred by Maxxim. One of the counts in this initial pleading sought a declaration that Zurich's refusal was a breach of the insurance contract. Judge Richard A. Siebel *sua sponte* dismissed the declaratory judgment claim with prejudice, stating that it was actually a breach of contract claim, and gave Chatham leave to amend. Chatham's second amended complaint included two breach of contract counts (counts I and VI), waiver (count II) and estoppel allegations (count III), and the previously dismissed declaratory judgment count (count IV). The parties filed cross-motions for summary judgment as to one of the breach of contract counts and the waiver and estoppel counts (counts I, II, and III), and after briefing and oral argument, Judge Paddy H. McNamara resolved the cross-motions in Zurich's favor, indicating that she agreed with the federal district court's analysis and conclusion that SSV was not contractually obligated to pay Maxxim's outbound freight costs. At a later date, Judge McNamara dismissed the declaratory judgment count as previously dismissed by Judge Siebel (count IV) and granted Zurich's oral

motion for summary judgment as to the additional breach of contract count (count VI). Chatham then voluntarily withdrew the remaining counts of its second amended complaint (counts V and VII). We also note that Chatham filed suit against Dann in the circuit court of Cook County, asserting insurance broker malpractice and negligence, and that the action was consolidated with the Zurich suit, but is still pending.

In this appeal from the disposition of its action against Zurich, Chatham first argues the sterilization contract is not relevant to the question of extra expense coverage, and that if Zurich wanted to incorporate the terms of the sterilization contract into the insurance contract, Zurich should have done so at drafting. In contradiction to Chatham's prior contention that there were no material facts in dispute and that cross-motions for summary judgment could be resolved in Chatham's favor, Chatham now contends "necessary" is an ambiguous term in the insurance contract which should be construed against Zurich, as the drafting party. Chatham asserts it may recover Maxxim's outbound freight costs as expenses "necessary" to facilitate ongoing customer service to Maxxim, even though Maxxim alone bore the expenses. Chatham concludes that Zurich breached its contractual obligation to pay the extra expenses and that the trial judge erred in granting summary judgment to Zurich on the breach of contract claim asserted as count I of Chatham's second amended complaint. Zurich responds that the facts surrounding Chatham's insurance claim are pertinent to the question of coverage and that the insurance contract's unambiguous requirements that extra expenses be both "necessary" and "incur[red]" by the insured were never met.

We note that count VI of the second amended complaint, entitled "breach of contract," was a variation on count I and that it is undisputed the trial judge granted Zurich's oral motion for summary judgment as to count VI "for the same reasons" the trial judge granted Zurich's written motion for summary judgment as to count I. Further, Chatham acknowledges it is relying on the "same reasons" and "same authorities" in defense of both counts. Accordingly, we will resolve the counts together, rather than engaging in subsequent, repetitive discussion of count VI.

The standard of review of an order granting summary judgment is *de novo*. *Levitt v. Hammonds*, 256 Ill. App. 3d 62, 64, 628 N.E.2d 280, 282 (1993). A reviewing court will reverse the entry of summary judgment if it determines that the prevailing party was not entitled to judgment as a matter of law or that a material question of fact exists. *Levitt*, 256 Ill. App. 3d at 64, 628 N.E.2d at 282. While the opposing party need not prove its case, it must present a factual basis that

would arguably entitle it to a judgment. *Lyon Metal Products, L.L.C. v. Protection Mutual Insurance Co.,* 321 Ill. App. 3d 330, 338, 747 N.E.2d 495, 502 (2001). If from the pleadings, depositions, affidavits, and admissions on file, the plaintiff fails to establish an element of his cause of action, summary judgment for the defendant is proper. *Lyon Metal Products,* 321 Ill. App. 3d at 338, 747 N.E.2d at 502.

■ Further, the construction of an insurance contract is a question of law. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.,* 166 Ill. 2d 520, 529, 655 N.E.2d 842, 846 (1995). A court must determine the intent of the parties when construing their contract. *Lapham-Hickey Steel,* 166 Ill. 2d at 529, 655 N.E.2d at 846. In order to determine the meaning of the policy and the intent of the parties, " 'the court must construe the policy as a whole [citations], with due regard of the risk undertaken, the subject matter that is insured and the purposes of the entire contract.' " *Lapham-Hickey Steel,* 166 Ill. 2d at 529, 655 N.E.2d at 846, quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Corp.,* 154 Ill. 2d 90, 108, 607 N.E.2d 1204 (1992). "A policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning." *Lapham-Hickey Steel,* 166 Ill. 2d at 529, 655 N.E.2d at 846. In addition, a court may not read an ambiguity into a policy just to find in favor of the insured. *Lapham-Hickey Steel,* 166 Ill. 2d at 530, 655 N.E.2d at 846. A policy provision is considered ambiguous if it is subject to more than one reasonable interpretation. *Outboard Marine,* 154 Ill. 2d at 108, 607 N.E.2d at 1212. "If the words in the policy are unambiguous, a court must afford them their *plain, ordinary, and popular meaning.*" (Emphasis in original.) *Outboard Marine,* 154 Ill. 2d at 108, 607 N.E.2d at 1212. "If the words of a policy can reasonably be given their plain, ordinary, and popular meaning, the provisions should be applied as written and the parties should be bound to the agreement they made." *Western Casualty & Surety Co. v. Brochu,* 105 Ill. 2d 486, 495, 475 N.E.2d 872, 876 (1985).

■ We are unable to find any ambiguity in the contract language regarding extra expenses. The coverage was limited to "necessary expenses you incur during the 'period of restoration.' " According to the policy, "you" is a reference to Chatham as named insured, and its subsidiaries as additional insureds, including SSV. Although the policy does not specifically define the word "necessary," that word is not ambiguous and has a plain, ordinary, and popular meaning of "being essential, indispensable, or requisite." Random House Webster's Unabridged Dictionary 1883-84 (1998). This commonly understood meaning encompasses expenses that the named and additional insureds to the policy, Chatham and SSV, were required to incur during

the reconstruction of the sterilization facilities. It does not encompass expenses that the insureds may have wanted to incur on a gratuitous or voluntary basis, which would have been the opposite of "necessary." It also does not encompass expenses that other, nonparties to the contract were required to incur during the facility reconstruction period. The only party required to pay for the cost of shipping Maxxim's sterilized products away from the alternate sterilization facilities was Maxxim itself, not Chatham or SSV. In addition, Chatham has failed to address the unambiguous requirement that Chatham or SSV actually "incur" the expenses Chatham now seeks to "recover." "Incur" is another term that was not defined in the contract, but it has a plain, ordinary, and popular meaning of "to become liable or subject to through one's own action; [to] bring or take upon oneself." Random House Webster's Unabridged Dictionary 969 (1998). Chatham never became liable or subject to the expense of Maxxim's outbound freight. Maxxim did.

There is a general and well-established rule that a court "will not add terms to the contract of insurance which the parties have not included in the language of the policy." *Walsh v. State Farm Mutual Automobile Insurance Co.*, 91 Ill. App. 2d 156, 164, 234 N.E.2d 394, 399 (1968). Accordingly, we cannot read a provision into Chatham's insurance contract with Zurich that requires Zurich to pay expenses incurred by a third party. We cannot conclude from the language of the contract that at the time of contracting Chatham intended to obtain coverage for third parties it did business with, or to undertake the expense of their coverage, or that Zurich intended to undertake the risk of extending coverage to unknown third parties. Even though Maxxim's outbound freight expenses were a consequence of the explosion at the Virginia sterilization facilities, they were not covered by the insurance contract at issue.

Our conclusion is not swayed by Chatham's citation to *Kay County Excise Board v. Atchison, T. & S.F. Ry. Co.*, 185 Okla. 327, 328, 91 P.2d 1087, 1088 (1939), for the proposition that the word " 'necessary' must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." The issue in that tax protest case was whether a board of education, which was given broad powers and discretion to maintain a suitable school system and "to incur all expenses, within the limitations provided by law, necessary to carry out and fulfull all powers [statutorily] granted," was authorized to buy band uniforms. *Kay County*, 185 Okla. at 327, 91 P.2d at 1087. We consider the Oklahoma

court's determination that band uniforms were "convenient, useful, appropriate, suitable, proper, or conducive to the end" sought in the teaching of band music, and therefore "necessary" for instruction in band music (*Kay County*, 185 Okla. at 328, 91 P.2d at 1088), to be a rather strained interpretation of the word "necessary." In addition, a four-judge dissent indicated the majority's interpretation was contrary to prior decisions of Oklahoma and other states' courts. *Kay County*, 185 Okla. at 330, 91 P.2d at 1090 (Gibson, J., dissenting, joined by Riley, Osborn, and Hurst, JJ.). Furthermore, it cannot be seriously contended that expenses Chatham has never been willing to incur itself were "convenient, useful, appropriate, suitable, proper, or conducive to" maintaining Chatham's relationship with its customer.

In addition, another court interpreting insurance policy language nearly identical to the language at issue also determined that "necessary" is not an ambiguous term and that it limited coverage to extra expenses that were incurred by the insured as " '[a]bsolutely essential *** needed to achieve a certain result or effect; requisite,' " due to the suspension of the insured's operations. *Butwin Sportswear Co. v. St. Paul Fire & Marine Insurance Co.*, 534 N.W.2d 565, 567 (Minn. App. 1995). In that case, the insured manufacturer proved $521,103 in losses after an equipment fire, and then sought $72,797 in fees charged by a service it had hired to assist with presenting the claim to the insurer. *Butwin Sportswear*, 534 N.W.2d at 567. The insurer rejected the third-party fees, and the court agreed the service's fees were not an essential expense. *Butwin Sportswear*, 534 N.W.2d at 567. The court reasoned that the insurer might well have paid all the covered losses without the service's involvement in the claim, and that the insured "engaged [the service] primarily in anticipation of conflict and to assure itself a maximum recovery, not out of necessity." *Butwin Sportswear*, 534 N.W.2d at 567. This additional analysis further supports our interpretation of the language involved here. Chatham contends this case stands for the proposition that expenses which necessarily result from a suspension of the insured's operations are covered, and Maxxim's outbound freight expenses are covered because they "would not have been incurred but for the explosion on June 13, 1997." Chatham's argument is ineffective because it fails to address the policy language requiring that the expenses were necessarily incurred by the insured, not by some third party.

We conclude that Chatham failed to establish any material facts which would arguably entitle it to judgment on its claims that Zurich breached the insurance contract by refusing to pay SSV or Chatham for Maxxim's outbound freight expenses under the extra expense portion of the policy. Zurich was entitled to judgment as a matter of law

on those claims (counts I and VI). Accordingly, the cross-motions for summary judgment were properly resolved in Zurich's favor.

Chatham is also arguing that waiver and estoppel occurred (1) about two weeks after the equipment explosion when Bill Lee of Zurich agreed with Chatham's insurance brokers, Charles Dann and Anna Lively of Dann, that all the freight charges were extra expenses and that it was allowable if Maxxim rather than SSV kept track of them, and (2) when Zurich issued three checks to Chatham between December 4, 1997, and August 20, 1998, in partial payment of the extra expenses, without specifying which particular expenses it was paying. Chatham contends the circuit court erred in granting summary judgment to Zurich on Chatham's waiver and estoppel claims, and that we should reverse and remand with instructions to grant Chatham's cross-motion for summary judgment. Zurich responds that Chatham has mischaracterized an initial conversation between Zurich and Dann regarding nothing more than how the claim would be presented, that the three partial payments were made after Zurich issued a reservation of rights letter on November 5, 1997, and that the record shows Zurich continually questioned its coverage of Maxxim's outbound freight expenses for at least two years before Chatham filed suit in Cook County.

The following additional facts are pertinent to the waiver and estoppel arguments.

We disregard Chatham's assertion of "fact" that Zurich conceded that it would have covered all inbound and outbound freight charges as SSV's "extra expenses" if Maxxim had delivered its unsterilized products to SSV's facility for SSV's shipment to and from the alternate sterilization facilities. Chatham supported this assertion only by citing paragraph 13 of its second amended complaint, yet in its answer to the pleading, Zurich denied that particular allegation. The assertion is actually an argument, and therefore it should not have been included in the statement of facts section of Chatham's brief. See 188 Ill. 2d R. 341(e)(6).

When Anna Lively of Dann was deposed on December 18, 2001, she indicated she had been working in the insurance industry since 1973, and had been a Dann account executive responsible for Chatham's account since 1985. Dann and Zurich were immediately notified of the equipment explosion on Friday, June 13, 1997, and the following week, she and Chatham's representative, Thomas Morthorst, discussed the fact that SSV was contractually required to continue processing for some customers, including Maxxim. The next day, Lively and Charles Dann of Dann spoke with Bill Lee at Zurich and informed him that it was extremely important that SSV continue to process

product for its biggest customer, Maxxim. Lively did not have a copy of SSV's contract with Maxxim, and neither did Lee, and she was relying on what Morthorst had said. According to Lively, "[O]ur question to [Lee] was, did we have to actually put all of the bills and process everything through [SSV] or could we let Maxxim keep track of all the extra expenses and then present the claim." In response, "[Lee] told us that we—he agreed that he felt that that was an extra expense, but that we really needed to talk to Jack Healy, that Jack was the adjustor and that everything needed to be run through Jack, and he gave us Jack's phone number." When asked whether the focus of the June 25 conversation with Bill Lee was "how SSV should process the paperwork that was going to be coming because of Maxxim's claim," Lively responded: "The focus was whether SSV should handle it or if we could let Maxxim keep track of their own expenses and then just give us an accounting of the extra expense over and above their normal operating expenses." Further:

"Q. So rather than have them bill SSV and SSV pays it and then submits it to Zurich, could Maxxim just go ahead and keep track of it and submit it to Zuric[h] themselves?

A. Well, that's correct.

Q. Okay. At that point did you believe that everything that Maxxim submitted with regard to their claim would be covered under the Zurich policy?

A. I had no way of knowing, since I didn't know what they would submit.

\* \* \*

Q. So [Zurich] couldn't have made any determinations with regard to what was and what wasn't covered at that point?

A. That's correct.

\* \* \*

Q. Okay. So you still had an expectation that Zurich would adjust this loss, whether it's put through Maxxim or SSV, according to its policies, terms and conditions, correct?

A. That's correct."

Lively and Dann called Jack Healy at Zurich that same day:

"We explained that we had talked to Bill Lee, who had told us to contact Jack, because he was the main clearing person for the claim. And that Bill—we explained the situation with [SSV]. We told him that Bill felt that it was extra expenses and that he didn't have any objection to us having Maxxim keep track of the expenses as long as Jack agreed.

Jack said that he needed to contact Shore & Asimov [a firm that would help Zurich process the claim] and talk to Keith Strohecker, and as long as he had no objections, it would be fine. And we left it

that he would get back to us if Keith had objections, otherwise that would be the way that the claim would be run, and that that would be communicated to Tom [Morthorst.]"

Neither Strohecker nor Healy subsequently contacted Dann to indicate there was an objection to how the claim would be handled. Lively thought Zurich "actually liked handling it this way better, because they could independently audit the numbers." When asked whether Healy had given any indication that there would be extra expense coverage, Lively responded:

"He didn't really say that there was coverage, he just said that— I'm trying to remember. That it would be handled as an extra expense, and that we could put it through and that Maxxim could keep track of the expenses."

Lively also indicated that as an experienced insurance broker, she knew when she spoke with Healy that Zurich would "do an adjustment of any claim that was submitted by either Maxxim or SSV with regard to the business interruption and extra expense claim." She also knew that Zurich "would have to wait to receive the actual claim before they would be able to make these determinations." When Lively was asked, "[W]ould any expense that the insured covers to keep [a] customer happy in the event of a loss be an extra expense[?]" she responded, "I think that it would be subject to adjustment just as the client's claim would be adjusted."

Lively relayed her conversation with Healy to Morthorst. When she "informed [Morthorst] that Zurich had agreed to let Maxxim keep track of the expenses," she did not "provide any other direction or instruction" to him. She worked for Chatham, not Zurich, and she had no authority to make coverage decisions for Zurich. She had experience with many business interruption extra expense claims, although she had never been involved in a claim of this size. Dann or SSV had numerous conversations with Healy with regard to the outbound freight charges "and about whether it was going to be covered or not or what portions of it they were going to cover. It was [Dann's] contention that as long as it was necessary, that it should be covered. But we all [a]greed not to dwell too much on the coverage issues until the numbers could be finalized."

During the claims process, Zurich did not take a "hard line position" that there was no coverage for outbound freight, but Healy did bring it up in several conversations and indicated coverage might be denied because SSV was not contractually obligated to Maxxim for those charges. Morthorst gave Lively a copy of a Maxxim letter indicating that Zurich met with Maxxim on August 11, 1998, and that Maxxim was displeased with Zurich's interpretation of the outbound

freight coverage. Further, Healy wanted Maxxim to make a claim with its own insurance company and then let that insurer subrogate against Zurich. During a meeting with Healy, Lively called Maxxim's insurance broker, who indicated that he did not want to make a claim on Maxxim's insurance coverage because Maxxim was not responsible for the explosion. At that point, Healy "backed down." Lively thought the issue may have come up again later and that Maxxim had again refused to file a claim with its own insurer. Healy also wanted to arbitrate the outbound freight question, but Lively thought Maxxim was unwilling to participate.

Thomas Morthorst, the chief financial officer and a vice president of a Chatham subsidiary responsible for handling the insurance claim, indicated during his deposition on December 20, 2001, that "[t]he outbound freight has been a point of contention for years." No one ever told Morthorst that if SSV rather than Maxxim shipped and paid for Maxxim's freight and submitted the records to Zurich that Zurich would pay the charges. The issue was not about who would keep the records, but whether there was coverage for outbound freight. He had known as early as the summer of 1998 that Zurich had not determined whether the outbound freight was covered. He knew that Shore & Asimov had been "backing out" the outbound freight numbers from the schedules they submitted to Zurich for payment under the policy, although he did not realize this when Chatham received the first partial payments from Zurich.

The record includes a letter from Healy to Morthorst dated November 5, 1997, and a letter from Healy to Maxxim dated November 19, 1997, regarding the claimed expenses. In both letters, Zurich reserved its rights and defenses with respect to the ongoing expense claim. During his deposition, Morthorst acknowledged that on or about November 6, 1997, he received the reservation of rights letter addressed to him. He asked Healy to withdraw it, but Healy refused. With Morthorst's agreement, Lively sent a written objection to Healy on or about November 7, 1997. Healy's letter to Maxxim indicated that Zurich would be undertaking "a thorough investigation of Maxxim's claim." Zurich offered to submit the outbound freight issue to binding arbitration proceedings, at Zurich's expense, but Maxxim said no.

The record also includes a letter from Healy to Maxxim dated December 16, 1997, indicating that Zurich "must confirm that the extra expenses submitted meet the terms and conditions of the policy." Healy concluded the letter by indicating that Zurich was reserving all of its rights and defenses with regard to Maxxim's ongoing expenses, and he sent a copy of the letter to Lively.

In a letter to Maxxim dated February 28, 1998, which Healy copied to Lively and Morthorst, Healy acknowledged Zurich's receipt of Maxxim's claim submission for the period from June 13, 1997, to January 18, 1998, which was in excess of $3.3 million. Healy indicated that Zurich's analysis and review of the claim was "continuing," but "based on our preliminary review of the Submission, it appears that various items may not be covered under the Zurich Insurance policy with SSV. The amount of these items may be significant." Healy suggested "these non-covered items" might be covered under Maxxim's own business income and extra expense coverage with the Indemnity Insurance Company of North America (IINA), and he offered to meet with an IINA adjustor in order to expedite resolution of the issue. He concluded the letter with reservation of rights language.

Morthorst also indicated during his deposition that he told Maxxim that Chatham would attempt to get Zurich to pay the outbound freight, but he never represented that if Zurich did not pay the charges, SSV or Chatham would pay them. There was no agreement between Chatham and Maxxim with regard to the outcome of Chatham's suit against Zurich.

Morthorst was again deposed on May 15, 2002, in conjunction with the SSV and Maxxim contract dispute in federal district court. Morthorst acknowledged that SSV had never paid any of Maxxim's outbound freight charges, and then the following exchange occurred:

"Q. So you want your insurance company to pay you money for something you did not incur, right?

A. Yes, because that's covered under my policy.

Q. And then you don't want to give the money to the people who incurred the expense?

A. That is not covered under the contract.

Q. So in your analysis, you think it would be fair and *** permissible for SSV *** just to keep the money?

* * *

A. There's nothing in my policy that says what I must do with the money that I'm entitled to under my insurance policy.

Q. Do you think that's fair?

A. Yes, I think that's fair."

■ Waiver consists of either an express or implied voluntary and intentional relinquishment of a known right. *Ames v. Crown Life Insurance Co. of Toronto, Canada*, 85 Ill. App. 3d 203, 204, 406 N.E.2d 222, 224 (1980). "It is essentially unilateral in character, focusing on an insurer's conduct, and requiring no prejudice to, nor detrimental reliance by, an insured. [Citation.] To constitute a waiver, the words or conduct of an insurer must be inconsistent with the intention to rely

on the requirements of the policy." *Ames*, 85 Ill. App. 3d at 204-05, 406 N.E.2d at 224.

We reject Chatham's contention that waiver occurred during the conversation between Bill Lee of Zurich and Anna Lively and Charles Dann of Dann shortly after the equipment explosion shut down SSV's processing capabilities. Lively's deposition testimony makes clear that Lee never indicated that Zurich would cover Maxxim's outbound freight expenses. Lee indicated that he would not be adjusting the claim and that the Dann representatives would have to contact the Zurich representative charged with adjusting responsibility, Jack Healy. Lively, an insurance professional with experience in processing business interruption claims, acknowledged at her deposition that she "had no way of knowing" when she talked with Lee whether all of Maxxim's claimed expenses would be covered by Zurich. She knew that Zurich would have to have the actual claim before Zurich could determine what would or would not be covered. Healy also never indicated that Zurich would cover Maxxim's outbound freight expenses. At most, Lee and Healy's statements regarding extra expenses were indications that Maxxim's freight costs could be categorized as extra expenses in the eventual claim, and Zurich would not deny coverage simply because SSV was not directly involved in the shipments. Nothing that Lee or even Healy said during those initial conversations with Lee and Dann was "inconsistent with the intention to rely on the requirements of the policy," and so waiver did not occur.

Similarly, Zurich's partial payments during the claims processing period do not constitute waiver of the outbound freight claim. Zurich's payments were consistent with its determination that Maxxim's inbound freight expenses were necessarily incurred by SSV or Chatham, and therefore covered under the Zurich policy. Zurich's payment of covered expenses cannot constitute waiver of payment of non-covered expenses. In addition, the record reflects the payments were made after Zurich issued reservation of rights letters. The record also reflects that Zurich repeatedly indicated to the Chatham, Dann, and Maxxim representatives, through letters, meetings, and telephone conversations, throughout the claims processing period in 1997 and 1998 that Zurich was questioning outbound freight coverage. The record also reflects that Zurich encouraged Maxxim to make a claim with its own insurer, where Zurich believed Maxxim would receive a favorable response. In short, Zurich's conduct was not "inconsistent with the intention to rely on the requirements of the policy," and did not amount to waiver.

■ "To establish estoppel in an insurance context, the insured

must show: (1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance." *Dumenric v. Union Oil Co. of California*, 238 Ill. App. 3d 208, 213, 606 N.E.2d 230, 233-34 (1992). It is not necessary that the insurer intended to mislead the insured in order for estoppel to apply. *Dumenric*, 238 Ill. App. 3d at 213, 606 N.E.2d at 233-34. "The burden of establishing prejudice rests with the insured and must be proved by clear, concise, and unequivocal evidence." *Laycock v. American Family Mutual Insurance Co.*, 289 Ill. App. 3d 264, 269, 682 N.E.2d 382, 386 (1997).

■ Our earlier analysis of Lee and Healy's conversation with Dann and Lively is applicable to Chatham's estoppel argument. The record in this case raises no question of material fact that Chatham was misled by any of Zurich's statements. Analysis of the remaining elements of estoppel is not necessary, but we also point out that Chatham fails to indicate how SSV changed its position as a result of Zurich's agreement to allow Maxxim to keep track of its expenses for the purposes of the eventual claim submission.

The record discloses that Chatham failed to raise any material facts which would arguably entitle it to judgment on its claims of waiver and estoppel (counts II and III). Instead, Zurich was entitled to judgment on those claims as a matter of law. For these reasons, we affirm the circuit court's resolution of those claims.

■ Chatham's final contention is that the first trial judge erred in *sua sponte* dismissing with prejudice Chatham's original declaratory judgment count, and the second trial judge erred in dismissing the repled count as previously dismissed. Chatham cites authority regarding declaratory judgment actions and their disposition. See, *e.g.*, *Aetna Insurance Co. v. Janson*, 60 Ill. App. 3d 957, 377 N.E.2d 296 (1978); *Chicago & Eastern R.R. Co. v. Reserve Insurance Co.*, 99 Ill. App. 3d 433, 425 N.E.2d 429 (1981). However, because the count sought a declaration that Zurich was liable for Maxxim's outbound freight under the extra expense coverage yet had refused to pay the expenses as claimed, we conclude the count was essentially a breach of contract claim. Our earlier determination that the unambiguous contract did not require Zurich to pay Maxxim's outbound freight expenses sufficiently resolves Chatham's final contention.

For these reasons, the orders appealed from are affirmed.

Affirmed.

O'MALLEY, P.J., and McNULTY, J., concur.