# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1401

PPM FINANCE, INCORPORATED, in its capacity
as agent for JACKSON NATIONAL LIFE
INSURANCE COMPANY,

*Plaintiff-Counter-Defendant-Appellee*,

*v.*


NORANDAL USA, INCORPORATED,

*Defendant-Counter-Plaintiff-Appellant*,

*v.*


PPM AMERICA SPECIAL INVESTMENTS CBO II, L.P.
and PPM AMERICA SPECIAL INVESTMENTS FUND, L.P.,

*Counter-Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 7987—**Amy J. St. Eve**, *Judge.*

———————

ARGUED SEPTEMBER 15, 2004—DECIDED DECEMBER 16, 2004

———————

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* In this commercial dispute, one creditor, Jackson National Life Insurance Company, sued another, Norandal USA, Incorporated, demanding that Norandal fork over a substantial sum of money it obtained from a common debtor, who we will simply call Scottsboro. The district court agreed with Jackson and granted its motion for summary judgment to the tune of $4.4 million, including prejudgment interest. Aggrieved by this decision, Norandal appeals.

Norandal is a processor of aluminum products. In February of 1999, it agreed to sell its Alabama processing plant to Scottsboro for approximately $92 million. To fund the acquisition, Scottsboro secured $69 million from Jackson, plus additional credit extensions. It got another $7.5 million loan from PPM America Special Investments CBO II, L.P. and PPM America Special Investments Fund, L.P. (collectively PPM). To cover the remainder, Scottsboro executed a promissory note to Norandal for $7.8 million. Thus, Jackson, PPM, and Norandal all became Scottsboro creditors.

To determine their relative rights, these creditors and Scottsboro entered into a subordination agreement giving Jackson a senior security interest in Scottsboro's assets. Under the agreement, Norandal was required to turn over to Jackson any payments it received from Scottsboro while Scottsboro was in default to Jackson. During negotiations, Norandal requested a provision that would require Jackson to notify Norandal of any defaults by Scottsboro. Jackson refused.

From October of 1999 through January of 2001, Scottsboro defaulted on several obligations to Jackson. Despite these defaults, Jackson continued to loan Scottsboro money, which Scottsboro in turn used to make 15 scheduled payments to Norandal. Jackson did not notify Norandal of Scottsboro's

defaults until July of 2001. Only days later, Jackson and PPM filed involuntary petitions for relief in bankruptcy against Scottsboro.

In November of 2002, Jackson filed this suit against Norandal to recover the money Norandal received from Scottsboro. Jackson's complaint alleged that Norandal breached the subordination agreement by not turning over the payments it received from Scottsboro at a time when Scottsboro was in default to Jackson. In response, Norandal filed three counterclaims, including one seeking a declaratory judgment that Jackson had no right to recover because it had failed to give prompt notice that Scottsboro had defaulted. We review the district court's entry of summary judgment to Jackson *de novo*, *Fix v. Quantum Indus. Partners LDC*, 374 F.3d 549, 552 (7th Cir. 2004). The same standard of review applies to the district court's interpretation of the subordination agreement, *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998).

This case presents rather straightforward questions of contract interpretation. Under Illinois law, courts must ascertain parties' intentions exclusively from an agreement's language if it is clear and unambiguous. *Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 604 (7th Cir. 2001); *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). And if clear and unambiguous, one party's particular interpretation of its terms at the time of execution is immaterial. *Kaplan*, 266 F.3d at 604; *Am. Nat'l Trust Co. of Chi. v. Ky. Fried Chicken of S. Cal., Inc.*, 719 N.E.2d 201, 211 (Ill. App. Ct. 1999).

Under the subordination agreement, Norandal could not accept or retain payments from Scottsboro if Scottsboro was in default to Jackson:

> 2.3. *Restriction on Payments.* Notwithstanding any provision of any Subordinated Debt Document to the contrary, no Obligor [Scottsboro] may make, and no

> Subordinated Creditor [Norandal] may receive, accept or retain any payment of principal, interest or any other amount with respect to the Subordinated Debt until the Senior Debt is paid in full . . . except that (I) [Scottsboro] may make and [Norandal] may receive scheduled payments of principal and interest . . . under the Subordinated Note on an unaccelerated basis so long as no Senior Default shall have occurred and be continuing or would result therefrom . . . .

The agreement further provides that Norandal must turn over to Jackson any funds it received in violation of section 2.3:

> 2.5. *Incorrect Payments.* If any payment or distribution on account of the Subordinated Debt not permitted to be made by any Obligor [Scottsboro] or received by any Subordinated Creditor [Norandal] under this Agreement is received by [Norandal] before all Senior Debt is paid in full in cash, such payment or distribution shall not be commingled with any asset of [Norandal], shall be held in trust by [Norandal] for the benefit of [Jackson] and shall be paid over to [Jackson], or [its] representatives, for application on a pro rata basis . . . to the payment of the Senior Debt then remaining unpaid, until all of the Senior Debt is paid in full in cash.

The district court concluded that this language is clear and unambiguous and requires Norandal to disgorge the money it received from Scottsboro. A contract provision is ambiguous only if it is subject to more than one reasonable interpretation. *Commonwealth Ins. Co. v. Stone Container Corp.*, 351 F.3d 774, 778 (7th Cir. 2003); *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 846 (Ill. 1995). Under section 2.5, note payments "not permitted to be made by [Scottsboro] or received by [Norandal] under this Agreement" "shall be paid over to [Jackson]." And under section 2.3, payments are not permitted to be made

if Scottsboro was in default to Jackson. These provisions are unequivocal and susceptible to only one reasonable interpretation—Norandal must remit to Jackson any money it received from Scottsboro while Scottsboro was in default to Jackson.

Norandal argues that the subordination agreement is ambiguous. Specifically, it claims that the payments made by Scottsboro to Norandal must have been permitted under section 2.3 because Jackson actually facilitated these payments by loaning Scottsboro more money. In support, Norandal cites the testimony of John Krupinski, Scottsboro's former CFO, who testified that Jackson knowingly permitted Scottsboro to make payments to Norandal despite it being in default to Jackson. But Jackson's post-default loans had no bearing on the parties' rights and obligations under section 2.3. Indeed, section 3 of the agreement expressly allowed Jackson to increase the amount of Scottsboro's senior debt without affecting Norandal's obligations under the agreement.

Norandal's primary argument is that Jackson was required to notify it that Scottsboro was in default and that Jackson's failure to do so bars it from recovering the money paid to Norandal. As the district court aptly noted, however, nothing in the subordination agreement required Jackson to notify Norandal of Scottsboro's default. Indeed, Norandal admits that it asked for a notice provision during contract negotiations, a request that Jackson rebuffed.

Faced with this situation, Norandal advances three arguments, which we reject. First, it argues that the agreement's silence regarding notice is a "gap," and that a notice requirement should be read into it. We initially note that Norandal forfeited this argument because it failed to make it before the district court. *E.g.*, *Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 1004 (7th Cir. 2003). Forfeiture notwithstanding, Norandal's contention is

frivolous. As Jackson points out, a gap in a contract arises when the contract does not account for unforeseen events. *See Dato v. Mascarello*, 557 N.E.2d 181, 183-84 (Ill. App. Ct. 1989). But here, Norandal sought a notice provision, failed, and then entered into the subordination agreement anyway. We know for a fact that the parties contemplated notice; its omission from the agreement was no oversight. Norandal is now seeking to rewrite the agreement to require notice, but courts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck. *See Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 154 (Ill. App. Ct. 2000); *Barille v. Sears Roebuck & Co.*, 682 N.E.2d 118, 122 (Ill. App. Ct. 1997); *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602, 610 (Ill. App. Ct. 1996).

Norandal also argues that notice is required because "senior default notice" is included in the subordination agreement's definition section. But this definition provision did not give Norandal the right to be notified because "senior default notice" did not appear anywhere else in the agreement. In contrast, the phrase "subordinated default notice" is defined in the agreement but also appears in section 6, which requires *Norandal* to notify *Jackson* if Scottsboro defaults. Despite Norandal's arguments to the contrary, there simply is no provision in the agreement imposing a reciprocal obligation.

Norandal's final argument on this point is that the district court erred by failing to consider extrinsic evidence showing that Jackson was required to provide notice under the subordination agreement. But courts look to extrinsic evidence to determine the parties' intentions only if an agreement is ambiguous, *e.g.*, *Air Safety*, 706 N.E.2d at 884, and as we have explained, this one is not. And in any event, the extrinsic "evidence" cited by Norandal does not support the interpretation it urges. Norandal points to the fact that Jackson actually gave it written notice of default just prior to Scottsboro's bankruptcy as evidence that notice was re-

quired. But just because Jackson ultimately notified Norandal of Scottsboro's default does not mean that its failure to do so earlier forfeited its right to recover under the agreement.

Norandal's next attack is factual. It contends that the district court erred by concluding that there is no genuine issue of material fact as to whether Scottsboro defaulted. Krupinski, aided by financial statements, testified that Scottsboro failed to maintain the minimum debt service coverage ratio, interest coverage ratio, and tangible net worth ratio; made unauthorized capital expenditures; failed to disclose certain inventory; and experienced a labor strike. All of these events violated the subordination agreement. In response to this evidence, Norandal advances only the testimony of Jeff Podwika, a PPM loan officer who testified that prior to December of 2000 he was "comfortable with the situation" as to Scottsboro. He also testified generally that when one of his accounts is in default, he typically sends some form of communication informing the borrower that it has defaulted. But this testimony was not specific enough to refute the evidence supplied by Jackson. Notably, Podwika did not specifically refute the testimony and financial statements offered by Jackson establishing that Scottsboro was in default nor did he say at any point that Scottsboro was not in default. Norandal failed to offer specific, concrete evidence suggesting that Scottsboro was not in default, which is fatal to its assertion that the case must be resolved by a jury. *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002) (nonmovant must present definite, competent evidence in rebuttal to defeat a summary judgment motion).

Norandal also argues that the district court erred in crediting Krupinski's testimony because he lacked personal knowledge about whether Scottsboro defaulted. But that is simply untrue. Krupinski directly participated in calculating the financial statements which demonstrated that Scottsboro was in default. Moreover, Norandal does not

identify which portions of Krupinski's testimony fell outside of his personal knowledge. And in any event, as Jackson correctly points out, Krupinski was designated as a witness under Fed. R. Civ. P. 30(b)(6), which authorized him to testify not only to matters within his personal knowledge but also to "matters known or reasonably available to the organization." *See Pugh v. City of Attica, Ind.*, 259 F.3d 619, 627 n.7 (7th Cir. 2001). Thus, Krupinski was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric.

Next, Norandal claims that Jackson waived its right to recover by facilitating Scottsboro's payments to Norandal. In Illinois, "waiver" is a voluntary and intentional relinquishment of a known right. *E.g.*, *Chatham Corp. v. Dann Ins.*, 812 N.E.2d 483, 494 (Ill. App. Ct. 2004). Waiver may be express through agreement or implied through conduct. *E.g.*, *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991). Here, we agree with the district court's conclusion that Jackson did not waive its right to recover. In the first instance, section 8 of the agreement required any waiver to be in writing and signed by the parties. That never happened. Despite this, Norandal claims that Jackson's post-default loans constituted an implied waiver. "Waiver will be implied when a party's conduct is inconsistent with an intention to assert the right." *Id.* Jackson's post-default loans to Scottsboro were not inconsistent with its later efforts to recoup that money pursuant to the agreement. Indeed, section 3 explicitly authorized Jackson to make additional loans without affecting Norandal's obligations under the agreement.

Finally, Norandal objects to the district court's award of prejudgment interest, a decision we review for an abuse of discretion. *E.g.*, *Ameritech Info. Sys., Inc. v. Bar Code Resources*, 331 F.3d 571, 574 (7th Cir. 2003). The Illinois Interest Act provides that a creditor shall be awarded interest at the rate of 5% per year for all moneys after they

become due on any "instrument of writing." 815 ILCS 205/2 (2002); *Sna Nut Co. v. Haagen-Dazs Co.*, 302 F.3d 725, 734 (7th Cir. 2002). The purpose of granting prejudgment interest is "to make a deprived plaintiff whole." *Jahn v. Kinderman*, 814 N.E.2d 116, 122 (Ill. App. Ct. 2004) (citing *In re Estate of Wernick*, 535 N.E.2d 876, 887 (Ill. 1989)). To demonstrate debt on an "instrument of writing," a creditor must establish three elements: (1) a written instrument that establishes indebtedness; (2) a specific or inherent due date; and (3) that the indebtedness is subject to easy calculation. *Adams v. Am. Int'l Group, Inc.*, 791 N.E.2d 26, 30 (Ill. App. Ct. 2003).

All of these requirements were met here. Norandal claims that the district court abused its discretion because the subordination agreement did not specify a due date when payments must be turned over. But under the plain terms of the agreement, money became due once Norandal failed to remit the payments it received from Scottsboro while Scottsboro was in default to Jackson. Thus, the time of default is clear—the contract contains an inherent due date. *See Reserve Ins. Co. v. Gen. Ins. Co. of Am.*, 395 N.E.2d 933, 940-42 (Ill. App. Ct. 1979) (recognizing time of default as an "inherent" due date to trigger entitlement for prejudgment interest). Norandal also argues that the agreement does not establish a debtor-creditor relationship because Jackson did not loan it money. But the Illinois Interest Act is not confined to lending institutions; rather, it applies generally to "creditors" on "instruments of writings." *See* 815 ILCS 205/2 (2002); *Ameritech*, 331 F.3d at 575 (rejecting similar argument). The subordination agreement clearly placed Norandal in the role of debtor vis-á-vis its senior creditor, Jackson. And finally, Norandal's claim that the amount owed is not easily calculated is frivolous—Norandal received 15 equal payments totaling close to $3.8 million after Scottsboro had defaulted. This sum is easily calculated.

For these reasons, the judgment of the district court is AFFIRMED.


A true Copy:

        Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*