FIRST DIVISION
March 13, 2006
(**Nunc pro tunc February 14, 2006**)

No. 1-04-2110

| | | |
|---|---|---|
| CECELIA GASTON, individually and on behalf of all others similarly situated, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| FOUNDERS INSURANCE COMPANY, | ) ) | Honorable Peter J. Flynn, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE BURKE delivered the opinion of the court:

Plaintiff Cecelia Gaston appeals from the circuit court's grant of summary judgment in favor of defendant Founders Insurance Company on plaintiff's complaint, in which plaintiff alleged that defendant's automobile claims procedures were unreasonable. On appeal, plaintiff contends that the trial court misconstrued the insurance policy at issue; misconstrued section 919.80(d)(6) of the Illinois Department of Insurance Regulations; erred in striking the testimony of its expert witness; erred in not finding that defendant's settlement practices violate section 155 of the Illinois Insurance Code; and erred in denying class action treatment of her claim. For the reasons set forth below, we affirm.

STATEMENT OF FACTS

1-04-2110

This case arose as a result of a disagreement concerning defendant's procedures for handling automobile collision claims. The relevant portion of plaintiff's policy, issued by defendant, is as follows:

"Coverage E - Collision. To pay for loss caused by collision to the owned automobile but only for the amount of each such loss in excess of the deductible amount stated in the declarations as applicable hereto. *** [T]he company shall have the following options: (1) Payment to the insured of the actual cash value of the vehicle minus the deductible stated in the policy declarations; or (2) Replacement of the vehicle with other of like kind and quality; or (3) Payment of the amount the company would have paid for a replacement vehicle (including all applicable taxes and license fees), in the event the insured elects a cash settlement instead of such replacement vehicle; or (4) Repair or rebuild the automobile.

***

Limit of Liability. The Company's limit of liability for all losses under Part III shall not exceed the smallest of the following:

(a) the actual cash value of stolen or damaged property or part thereof at the time of the loss;

(b) the amount necessary to repair the damaged property at the time of the loss;

(c) the amount necessary to replace the stolen or damaged property at the time of the loss with like kind and quality property less depreciation; or,

(d) the applicable value, if any, stated in the declarations. ***

Condition 11 - Part III: The company may pay for the loss in money; or may repair or replace the damaged or stolen property."

On July 13, 2002, plaintiff's car was involved in an accident and sustained body damage. On the day of the accident, plaintiff phoned defendant, her insurance company. Defendant informed plaintiff that it would send its own collision appraiser out to create an estimate on the amount of repair work her vehicle needed and that it would not pay any amount above that estimate. Defendant informed plaintiff that, under her policy, she could take her car to a body shop that participated in defendant's direct repair program (DRP) or to any other shop of her liking. If she chose a DRP shop, she was told, then her only cost for all repairs and storage would be her $500 deductible. If she chose another shop, she would be

responsible for her deductible as well as for any cost above what was deemed necessary by defendant, including daily storage fees. Defendant then gave plaintiff a list of Chicago-area DRP shops and suggested Elar Auto Rebuilders, which was nearby.

On July 17, 2000, plaintiff spoke with defendant's claims adjuster and informed her that she had taken her car to West Loop Auto Body (West Loop). The claims adjuster informed plaintiff that West Loop was not a DRP shop and outlined the financial consequences to plaintiff if she had her car repaired there. She then offered to arrange to have plaintiff's car towed, free of charge, to Import Auto, a nearby DRP shop that did body work on all types of cars, including those from Loeber Motors.

On July 20, 2000, defendant's appraiser inspected plaintiff's car and prepared an estimate of $610.23. This estimate was made using a labor rate of $22 per hour for body work, $11 per hour for paint work, and $35 per hour for mechanical work, which was the rate defendant had negotiated with its DRP shops. By this time, West Loop had also prepared an estimate of the damage to plaintiff's car in the amount of $1,190.93. This estimate was made using a labor rate of $38 per hour for paint and body work and $79 per hour for mechanical work.

On July 24, 2000, defendant sent plaintiff a letter to again explain the costs she would be responsible for if she had the car repaired at West Loop, including the $50 per day storage fee she was already incurring. Two days later, defendant called plaintiff, told

her that defendant would pay only $610.23 toward the repair of her car and again offered to pay for a tow of her car to a nearby DRP shop which would store and repair her car without any additional cost to plaintiff. Plaintiff then informed defendant that she wished to have her car repaired at West Loop. Defendant told plaintiff that it should be notified and allowed to re-inspect her car if West Loop found any damage beyond that contained in its original estimate.

On August 1, 2000, defendant spoke with Bill Passaglia, an owner of West Loop, who confirmed that he was charging plaintiff $50 per day in storage fees. During this conversation, Passaglia demanded that defendant pay the entire amount he was charging for repairs on plaintiff's car and threatened a lawsuit if payment was not made. Defendant then called plaintiff again to outline the consequences of having her car repaired at West Loop as opposed to a DRP shop.

Records indicate that plaintiff's car was repaired at West Loop from July 13 to August 2, 2000, and that plaintiff's bill for repair was $3,097.64, with an additional $900 charged for storage. On August 22, defendant spoke again with Passaglia and told him that, by custom, he was required to notify defendant if he found any additional damage to plaintiff's car and to cease any additional repairs until defendant's appraiser arrived to create his own estimate. Defendant was not told that plaintiff's car had already been repaired or that two additional estimates and repair orders had

been issued on it. Specifically, West Loop had billed plaintiff for work on her car's sub-frame, steering components, and transmission that was not included on either West Loop's or defendant's original estimates. The record indicates that plaintiff ultimately paid West Loop $2,993.11 for repairs and storage and that defendant tendered $110.23 to plaintiff, which represented the amount of defendant's estimate less plaintiff's $500 deductible.

In September 2000, plaintiff complained to the Illinois Department of Insurance concerning this matter and was told, in a letter, that defendant had not violated either the Illinois Insurance Code or any insurance regulations.[1] On December 5, plaintiff filed a class action complaint against defendant, as well as a motion for class certification. Plaintiff claimed that defendant (1) breached the contract of the insurance policy at issue; (2) violated section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2000)); and (3) violated section 505 of the Consumer Fraud and Deceptive Trade Practices Act (815 ILCS 505/1 (West 1999)). Shortly thereafter, defendant issued a check to plaintiff in the amount of $3,527.33, which represented the full amount of plaintiff's West Loop bill, plus interest compounded from July 13, 2000. Defendant expressed a desire to settle this claim and any other claims including attorney fees, as a separate matter, in a letter that accompanied the check. Plaintiff refused the

---

[1]While the response letter from the Department of Insurance is contained in the record, plaintiff's original correspondence is not.

tender.

Defendant then filed a motion to dismiss plaintiff's complaint, which was granted. In the same order, the trial court also granted plaintiff leave to file an amended complaint, struck the class action aspect of the complaint under section 155 of the Insurance Code, and ordered that the motion to certify the class was to be held in abeyance.

A series of motions, responses, and replies followed over the next two years, resulting in an amended class action complaint, containing the same three causes of action as the original complaint. Defendant's subsequent motion to dismiss was granted as to the class action allegations under section 155 of the Insurance Code and the Consumer Fraud Act claim. Defendant was then directed to answer the remaining portions of the complaint, which it did.

During the course of this litigation, defendant attempted to arrange an inspection of the subject car by an independent agency several times, succeeding only when it obtained a court order. The independent agency's inspection found several indications that West Loop may not have performed all of the operations for which it billed plaintiff. The independent inspector based his findings on indicia such as tool marks, corrosion, and factory-installed decals on parts. Defendant also had one of its own employees, an individual with many years of experience in the auto body field, inspect the vehicle. Defendant's employee took over 100 photographs of the vehicle, opined that the extent of the damage claimed on West

Loop's invoice was not present during defendant's initial inspection of the vehicle before repairs were made, and concurred with the independent inspector that there were indications that West Loop did not perform all the work it claimed to have performed and that the sub-frame, steering, and transmission repairs were not necessary.

In April 2004, plaintiff filed a motion for summary judgment on her claims for breach of contract and violation of section 155 of the Insurance Code. In her motion, plaintiff contended that defendant implemented a "scheme" by which it systematically adjusted claims in a manner that constituted a violation of Illinois insurance statutes, which was a *per se* breach of contract, perpetrated through its use of "bogus labor rates to calculate the cost of necessary automobile repairs." Plaintiff also argued that the extra-contractual remedy afforded by section 155 of the Insurance Code should be imposed, claiming that defendant relied on its significant economic advantage and bargaining power to shift the obligation to pay for reasonable repairs to the insured by imposing its "discount estimate" as a bar to collecting full value of the insurance policies its insureds contracted for. Additionally, plaintiff contended that defendant violated section 919.80(d)(6) of the Department of Insurance Regulations, specifically the requirement that "[t]he estimate prepared by or for the company shall be reasonable, in accordance with applicable policy provisions, and of an amount that will allow repairs to be made in a workmanlike manner." Defendant's estimate, contended plaintiff, was

8

not reasonable.

During discovery, plaintiff deposed Louis DiLisio, an individual with close to 40 years experience in the auto repair and auto claims industries, and planned on introducing his opinion that West Loop's $38 per hour labor charge was "reasonable." DiLisio based his opinion on a "survey" he conducted of Chicago area body shops, and on his experience in the field, which consisted of many years of working in body shops in New York and for an auto claims industry service provider in Chicago. When pressed, DiLisio explained that his survey consisted of telephone calls to five Chicago area body shops where he had cordial relationships with the operators. The trial court granted defendant's subsequent motion to strike and bar DiLisio's testimony on May 6, 2004.

On May 13, 2004, defendant filed a combined response to plaintiff's motion for summary judgment and cross-motion for summary judgment. In its response, defendant pointed out that plaintiff filed all her actions as class actions despite the fact that no class had been certified; that Passaglia admitted in his deposition[2] that West Loop's customary procedure would have been to notify plaintiff's insurer of the additional work it was planning to do to allow the insurer to re-inspect the vehicle, but that he did not follow this procedure in this instance; that at the same time West Loop charged plaintiff $38 per hour for labor, it charged other customers at rates varying from $21 per hour to $28 per hour as

_____

[2]The deposition was not included in the record.

9

evidenced by other West Loop estimates; that the Consumer Fraud Act claim was dismissed at an earlier proceeding; and that plaintiff's motion relied on the testimony of Louis DiLisio, which had been barred by the trial court.

In its own motion for summary judgment, defendant stated that it fully complied with the plain language of the policy when it issued the check for repair to plaintiff. Defendant relied on the endorsement given its procedures by the Department of Insurance, as evidenced by the September 2000 letter sent to plaintiff. Defendant addressed the issue of violating section 155 of the Insurance Code by pointing out that (1) plaintiff had not disclosed any information relating to attorney fees sought, which is a requirement for section 155 claims; (2) plaintiff refused the December 2000 offer of settlement, which encompassed attorney fees, thus precluding any further claims for attorney fees; and (3) even if section 155 violations were found, defendant should only be liable for the 25% amount that was in effect at the time of plaintiff's claim, not the current 60%, that was enacted during the pendency of this case. Finally, defendant argued that the striking of DiLisio's testimony rendered plaintiff's argument, that West Loop's rates should be considered "reasonable," baseless.

Defendant attached several supporting affidavits to its motion, including one from the telephone service representative who initially told plaintiff about the DRP and one from the claims adjuster who handled plaintiff's claim. A further affidavit, from

defendant's physical damage manager, included a listing of the "customs and practices" in the auto repair industry in Chicago and northern Illinois. The list included observations that many insurers have agreements with body shops to provide quality repairs at agreed-upon rates and that, when an insurer recommends an insured to such a shop, both the shop and the insurer guarantee the work to the insured. The list also included the physical damage manager's belief that it is customary for the body shop to notify the insurer should the need for additional work on the vehicle arise. Additional customs, according to the physical damage manager, include insurers notifying insureds of their financial responsibility should they opt not to use the DRP, and paying to tow a car to a DRP shop. An affidavit from the owner of a body shop in defendant's DRP corroborated all of these points and confirmed that it performed work for defendant at a $22 per hour labor rate.

On June 25, 2004, a hearing was held on the motions for summary judgment and the motion to bar the testimony of DiLisio. During the hearing, the court questioned plaintiff's attorney regarding the quality of repair at issue, as follows:

"THE COURT: Now, there is no direct evidence as I understand it that the places to which Founders wanted to direct Mrs. Gaston couldn't have done the job perfectly well, is there?

MR. GOLD [Plaintiff's attorney]: No.

11

THE COURT: Okay.

MR. GOLD: They could have."

In evaluating the disputed testimony of DiLisio, the trial court noted that:

> "Mr. DiLisio is certainly qualified to talk about repair costs, and given an appropriate amount of homework I suppose he might be qualified to talk about Chicagoland repair costs. *** [But] the five phone calls made by Mr. DiLisio in my view provide nothing remotely approaching an adequate database for the conclusions that he is asserting, unless he is defining the terms he is using, like 'reasonable in the marketplace' in a completely different way than I think the rest of us are talking about."

The trial court then denied plaintiff's motion for summary judgment, granted defendant's motion for summary judgment, and granted the motion to bar the testimony of DiLisio. This appeal followed.

## ANALYSIS

Preliminarily, defendant contends that plaintiff did not invoke the appraisal provision of the policy and therefore is barred from raising this issue. Plaintiff makes no reply to this allegation.

12

Generally, issues raised for the first time on appeal are waived. *Daley v. License Appeal Comm'n of City of Chicago*, 311 Ill. App. 3d 194, 200, 724 N.E.2d 214 (1999). A review of the record reveals that plaintiff failed to raise this issue at any time prior to her appeal. Accordingly, plaintiff waived this issue for purposes of this appeal.

A secondary initial matter concerns defendant's attempted settlement offer early in the proceedings. Defendant contends that, by virtue of its tender of the entire amount of plaintiff's claim, plus interest, plaintiff's class action for breach of contract was rendered moot. Plaintiff counters that it is well settled that a putative class representative cannot be "bought off."

The tender of a settlement offer to a putative class representative after class certification is sought, but before class status is granted, does not deprive the class representative of standing or moot his or the class members' claims. *Deposit Guaranty National Bank, Jackson, Mississippi v. Roper*, 445 U.S. 326, 332-36, 63 L. Ed. 2d 427, 100 S. Ct. 1166 (1980). In the instant case, the offer of full payment to plaintiff was not made until after she sought class certification. *Roper* is therefore applicable and, accordingly, we find that defendant's settlement offer did not deprive plaintiff of standing nor render her claim moot.

## Payment of Loss Provision

Plaintiff contends that defendant failed to show that its

13

liability for paying the entire claim was not limited or excluded by the policy and that defendant's failure to pay the entire claim was a breach of contract. Plaintiff relies on the theory that defendant failed to exercise its option to repair. Plaintiff points to the "payment of loss" (POL) provision of the policy in support of her contention. Plaintiff argues that POL provisions are standard terms in policies of property damage insurance and give the insurer two options for settling a claim where the insured's property is damaged but not destroyed: (1) pay the loss in money so that the insured can have the repairs done by a contractor of his or her choice, or, (2) undertake the repairs itself by hiring contractors and otherwise controlling the repair process.

Plaintiff contends that the record establishes that defendant never exercised its option to repair her vehicle, which bound it to pay the entirety of her repairs. Plaintiff also contends that defendant failed to present any evidence that it ever communicated to her in a clear, positive, distinct, and unambiguous way that it wanted to exercise its option to repair the subject vehicle. Plaintiff points primarily to the lack of any written correspondence being sent to her, noting that defendant failed to send any sort of unequivocal notice to her that it was exercising its right to repair. Plaintiff also notes that defendant told her that she was free to have her car repaired at West Loop, and that, while defendant sets forth numerous statements of assurance in its affidavits and briefs, there is no evidence that such statements

14

were ever made directly to her at the outset of the matter. Plaintiff further contends that the fact that defendant attempted to settle her claim based on a written estimate is enough to establish that it opted to pay the loss in money rather than exercise its option to repair.

Plaintiff also contends that defendant attempted to force her into choosing between (1) accepting its payment based on the estimate created by defendant's appraiser, and (2) having her vehicle repaired by a third-party shop chosen by defendant without any assurance that the insurer would accept the responsibility for the repairs performed by that shop. This ongoing tactic, contends plaintiff, allows defendant to force policyholders to choose a DRP shop, which then allows defendant to benefit from the lower rates it has negotiated with the shop while simultaneously distancing itself from the liability that would have arisen if defendant had properly exercised its option to repair.

In support of her argument, plaintiff relies heavily on *Howard v. Reserve Insurance Co.*, 117 Ill. App. 2d 390, 254 N.E.2d 631 (1969), a case involving a building fire and the disagreement between the parties as to whether the defendant insurance company exercised its option to repair. The *Howard* court set forth five criteria that make the notice of an insurer's election to exercise its option to repair effective: (1) it must be made within a reasonable time after the damage or loss has occurred to the insured; (2) it must be clear, positive, distinct, and unambiguous;

15

(3) the repairs or replacements must be made within a reasonable time; (4) it cannot be coupled with an offer of compromise or be made for the purpose of forcing a compromise, but it must be an election made with no alternative; and (5) when the election is made, the repair or replacement must be suitable and adequate. *Howard*, 117 Ill. App. 2d at 399. The *Howard* court further noted: "We adopt these criteria, however, with this caution that most legal controversies present differences which must be decided individually within the legal and factual bounds therein contained." *Howard*, 117 Ill. App. 2d at 399.

In summarizing her argument, plaintiff states that defendant was free to negotiate whatever rates it wanted with the body shops on its list and, further, to exercise its option to have plaintiff's vehicle repaired at any one of those shops. Plaintiff maintains, however, that because defendant failed to comply with the policy's POL provision in the first instance, it waived its right to raise the option to repair as grounds to reduce her claim or as a defense to an action on the policy. Plaintiff contends that the trial court should have found that once defendant waived its option to repair, it was required to reimburse her for the amount she actually paid to have her vehicle repaired.

Defendant contends that the policy in question does not, as plaintiff argues, require it to indemnify or reimburse plaintiff for the "amount she paid" to repair her vehicle. The amount paid for repairs, argues defendant, is irrelevant in that the policy binds it

16

to arrange for workmanlike repairs regardless of cost. Defendant notes that, in her brief, plaintiff agreed that "Founders was free to negotiate whatever rates it wanted with the body shops on its list and further, to exercise its option to have [her] vehicle repaired at any one of those shops."

Defendant further contends that it did all it could or should to exercise its repair option under the policy, but that plaintiff refused to allow the designated repair shop to tow or repair the vehicle, despite several offers and explanations given by defendant. Defendant argues that the option to pay for repairs or to have the vehicle repaired did not belong to plaintiff; instead, the policy expressly reserved those options to defendant. A plaintiff car owner, contends defendant, cannot insist on payment for repairs simply by refusing to allow the insurer to repair the vehicle. Defendant further argues that it did not violate its policy and, in fact, plaintiff was the party in violation as evidenced by her refusal to let defendant repair the vehicle. Expounding on this argument, defendant relies on plaintiff's own in-court admission that defendant's chosen shop would have done the repair work perfectly well. Lastly, defendant, citing *Home Mutual Insurance Co. of Iowa v. Stewart*, 105 Colo. 516, 100 P.2d 159 (Colo. 1940), argues that insurers are only obligated to pay the lowest sum for which the car can be repaired when insureds thwart the insurer's direct repair efforts.

In response to plaintiff's repeated arguments that defendant

17

made no assurance to plaintiff regarding the quality of the repair work, defendant cites *Mockmore v. Stone*, 143 Ill. App. 3d 916, 919, 493 N.E.2d 746 (1986), which held that liability is imposed on an insurer who chooses a body shop by operation of law. It would have been legally impossible, defendant argues, for it to not guarantee the work. In support of this argument, defendant relies on (1) the affidavit of the owner of Elar Auto Rebuilders, who guaranteed his shop's work, and (2) the affidavit of defendant's physical damage manager, who guaranteed the work of all the shops in the DRP. Defendant points to the absence of any counteraffidavits, admissions, or depositions submitted by plaintiff to rebut these facts as evidence of plaintiff's failure to raise a genuine issue of material fact required to defeat a motion for summary judgment.

Defendant further argues, with respect to its labor rates and final bill, that they are a nonissue and relies on plaintiff's own words in support of its argument. Defendant quotes from plaintiff's argument that "[i]f an insurer can get a body shop to do quality work for which the insurer will assume liability, the shop's labor rates become a non-issue." Defendant labels this statement as one that precisely sums up the case before us. Defendant argues that, because it arranged for a shop to do quality work, and assumed responsibility for the completeness and quality of the repairs, the rates plaintiff complains of are immaterial. As to the final bill and disparity between estimates, defendant points out that plaintiff never let it re-inspect the vehicle to estimate the additional

18

damages West Loop supposedly found during repairs and that an independent inspector found evidence that the additional work charged on West Loop's final bill may not have been performed or, if performed, not necessary.

"Summary judgment is appropriate only where there is no genuine issue of material fact." *State Farm Fire & Casualty Co. v. Moore*, 103 Ill. App. 3d 250, 257, 430 N.E.2d 641 (1981). The standard of review for the granting or denial of a motion for summary judgment is *de novo*. *In re Estate of Hoover*, 155 Ill. 2d 402, 411, 615 N.E.2d 736 (1993). Bare contentions in the absence of citation of authority do not merit consideration on appeal and are deemed waived. *City of Highwood v. Obenberger*, 238 Ill. App. 3d 1066, 1073-74, 605 N.E.2d 1079 (1992).

Plaintiff's argument wholly rests on her stated belief that if an insurer does not exercise its option to repair, it must then pay the insured money so that the insured can have repairs done by a contractor of her choice. Plaintiff fails, however, to cite any case law or other supporting authority lending credence to such an assumption. A reading of the actual policy reveals no text granting the insured the option to have such unfettered control over the repair process when the insurer fails to exercise its direct repair option. Rather, the actual wording of the policy obligates the insurer to pay "the amount necessary to repair the damaged property at the time of loss."

A thorough examination of the POL provision issue, then, would be in order only if the trial court's determination that defendant complied with the terms of the policy was in error. Put simply, if

19

it was found that defendant did indeed exercise its repair option, notwithstanding plaintiff's refusal to comply with its efforts, then plaintiff has no claim for breach of contract. On the other hand, if it were found that defendant did not exercise its repair option, but did provide plaintiff with what was necessary to repair her vehicle, there would also be no grounds for breach of contract. Accordingly, we must turn to the issues of policy interpretation and defendant's compliance with section 919.80(d)(6) of the Insurance Regulations.

Policy Interpretation and Section 919.80(d)(6)
of the Department of Insurance Regulations

Plaintiff contends that the trial court erred in its decision to grant summary judgment in favor of defendant based on its misinterpretation of section 919.80(d)(6) of the Department of Insurance Regulations, specifically the sentence: "The estimate prepared by or for the company shall be reasonable, in accordance with applicable policy provisions, and of an amount that will allow repairs to be made in a workmanlike manner."

Plaintiff contends that, by taking the position that the contract term "necessary" should be construed as limiting the insurer's liability for paying claims at the rates charged by the shops with which the insurance company had arranged volume discounts, all defendant really did was concede that the term has a hidden or alternative meaning that is not defined in the policy and that may not have been understood by a layperson; in other words,

that it is ambiguous and should be construed strongly against the insurer as the drafter of the policy.

Turning to the term "reasonable estimate" in section 919.80(d)(6) of the Department of Insurance Regulations, plaintiff contends that it would be absurd to construe that term as anything other than "the objectively reasonable cost of repairs in the marketplace." According to plaintiff, by manipulating the labor rates and leaving a few necessary repairs off of a repair estimate, unscrupulous insurers can make just about any claim fall just above or just below the policyholder's deductible and thereby cheat customers out of benefits that they are legitimately due under their policy. At a bare minimum, plaintiff argues, there is a genuine issue of material fact as to whether defendant's repair estimate was "reasonable" as that term is used in section 919.80(d)(6) of the Department of Insurance Regulations.

In addressing plaintiff's argument regarding the term "necessary repairs," defendant posits that plaintiff seeks to impose upon an insurer a duty to pay for whatever additional damage that any body shop chosen by an insured may claim to find during the course of repairs, like the additional damage that was found by West Loop but hidden from defendant. Defendant contends that the policy does not obligate it to pay what it would cost plaintiff to have her car repaired on her own. Defendant points to repeated references to "the company" in the policy as evidence that the provision refers to and limits liability to the cost of repairs incurred by the

insurance company rather than any costs incurred by the insured car owner. The policy, continues defendant, does not refer to necessary expenses incurred by "you" or "the insured," but rather clearly refers to repair costs incurred by "the company."

Defendant also argues that there is no ambiguity in the term "necessary to repair" because an ordinary layperson would not even consider the labor rates paid to the repair shop, much less read certain unspecified labor rates into the policy. Instead, defendant argues, the ordinary layperson cares only that his or her car is properly repaired and that he or she is not required to pay any more than the deductible amount for the repairs, which is exactly what defendant offered to plaintiff.

In response to plaintiff's contention that defendant should have disclosed its DRP to plaintiff when she purchased her policy, defendant argues that, under the terms of the policy, the option to repair the car lay with defendant, not plaintiff. This arrangement gave defendant control of the repairs, including the choice of body shops. Defendant further argues that, since plaintiff admits that defendant's chosen shops would have performed the repairs perfectly well, she could not have been harmed in any way by defendant's choice of shop or the price paid by defendant to the shop. Defendant maintains that it informed plaintiff four times of the DRP before she incurred the expenses at West Loop, which she knew were not going to be paid for by defendant. Defendant labels plaintiff's claim that she was harmed by any misrepresentation or lack of

22

disclosure regarding defendant's agreements with certain body shops as "disingenuous" because, it claims, she made an informed and conscious decision to incur the extra charges from West Loop.

Defendant also contends that plaintiff's interpretation of the policy as requiring payment of high labor rates would only benefit body shops, which are not even parties to the insurance contract. Accordingly, defendant argues that since the parties to the insurance contract clearly did not intend to benefit body shops by ensuring them higher rates, fees, and payments, it is unreasonable to interpret the policy provision as requiring those higher, allegedly "reasonable" body shop rates. Defendant further points out that plaintiff fails to delineate to whom the labor rates should be "reasonable" and does not suggest how any labor rate or repair bill, whether high or low, could be proved to be unreasonable.

Continuing in its argument concerning the term "reasonable," defendant relies on the evidence showing that West Loop's rates varied widely from customer to customer. While West Loop charged plaintiff as much as $79 per hour, it charged other customers various other rates as low as $21 per hour. Defendant then couples that disparity with the uncontradicted affidavits showing more than 30 Chicago area body shops charging the same labor rates as used in defendant's estimate to illustrate the range of labor rates that could possibly be deemed "reasonable."

Defendant further contends that, to both the insured and the insurer, the lowest obtainable rate for the same quality repairs

would seem reasonable. Defendant argues that any higher rates would only seem reasonable to the body shops receiving the inflated fees and that such a scheme would deprive insurance companies, insured car owners, and individual body shops of their respective abilities to negotiate better terms for themselves. Such a system, defendant contends, would benefit only the higher priced body shops because, while insureds would receive the same quality repairs at any price, insurers would end up paying more for repairs and lower priced shops would lose their competitive advantage.

Defendant points to plaintiff's rejection of its offer of payment of the full amount she claimed under the policy plus interest as evidence of plaintiff's real motive behind this case, *i.e.*, to benefit body shops and their attorneys. Defendant notes that the attorneys who represent plaintiff in this case also represent West Loop and have brought several class actions like this one in an effort to compel insurance companies to pay higher labor rates to body shops.

Defendant bolsters its argument by maintaining that its practices do not violate public policy, as plaintiff implies, by pointing out that our legislature focused on this issue in 1997. Defendant highlights House Bill No. 1502, which, if enacted, would have prohibited insurance companies from restricting the choice of an auto body repair facility. The General Assembly's decision not to bar the practice, contends defendant, demonstrates that it is not against public policy. The courts, defendant asserts, should not

carve out new substantive law, as plaintiff requests, which the legislature has expressly rejected. As further support for its argument, defendant turns to the Department of Insurance, which advises consumers on its website that if they choose a repair shop which charges more than the insurance company's suggested shop, the consumer may have to pay the difference himself. Also, defendant points out, the Department of Insurance not only approved the issuance of the policy and limit of liability at issue in this case, but also found that defendant did not violate the Insurance Code or the Department of Insurance Regulations in this particular instance.

Defendant contends that it complied with every aspect of section 919.80(d)(6) of the Department of Insurance Regulations in that it provided plaintiff with the names of more than one repair shop, which admittedly would have made the repairs to her car in a workmanlike manner. Defendant defends its repair program by pointing out that it has spared its insureds the time and trouble of dealing with body shops by inspecting, negotiating with, and approving quality and price with all the shops in its DRP. Defendant argues that most insureds lack the knowledge, training, or resources to do these things and would be at a disadvantage when dealing with body shops, as evidenced by the high rates imposed on plaintiff by West Loop.

The court's primary objective in interpreting an insurance policy is to ascertain and give effect to the intention of the parties, as expressed in the policy language. *Hobbs v. Hartford*

*Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17, 823 N.E.2d 561 (2005). While ambiguous terms in insurance policies are construed in favor of the insureds, that rule of construction only applies when the policy is ambiguous. *Hobbs*, 214 Ill. 2d at 17. The word "necessary" is not ambiguous and has a plain, ordinary, and popular meaning of being essential, indispensable, or requisite. *Chatham Corp. v. Dann Insurance*, 351 Ill. App. 3d 353, 358, 812 N.E.2d 483 (2004).

An insurer's election to repair an insured's vehicle, together with its selection of the means by which such repairs are to be accomplished, imposes a contractual liability for damages resulting from negligent repairs. *Mockmore*, 143 Ill. App. 3d at 919. An attorney's statement in court constitutes a binding admission of the party which cannot be refuted. *Darling v. Charleston Community Memorial Hospital*, 50 Ill. App. 2d 253, 328, 200 N.E.2d 149 (1964).

Unless the terms of a policy are against public policy when applied, the terms determine the benefits available under the policy. *Parish v. Country Mutual Insurance Co.*, 351 Ill. App. 3d 693, 699, 814 N.E.2d 166 (2004). "This court has held declaring a policy provision void as against public policy is an 'extraordinary remedy' which this court finds 'unpalatable.'" *Parish*, 351 Ill. App. 3d at 699. Illinois courts may not establish public policy which is contrary to the public policy that the legislature has deemed appropriate for the state. *State Farm Mutual Automobile Insurance Co. v. Smith*, 197 Ill. 2d 369, 376, 757 N.E.2d 881 (2001). Where the Director of Insurance takes no action against an insurance policy provision, it can be inferred that the Director

26

1-04-2110

felt the provision did not violate any part of the Insurance Code. *Bernardini v. Home & Automobile Insurance Co.*, 64 Ill. App. 2d 465, 467-68, 212 N.E.2d 499 (1965).

Section 919.80(d)(6) of the Department of Insurance Regulations states:

"If partial losses are settled on the basis of a written estimate prepared by or for the company, the company shall supply, upon request of the insured, a copy of the estimate upon which the settlement is based. The estimate prepared by or for the company shall be reasonable, in accordance with applicable policy provisions, and of an amount which will allow for repairs to be made in a workmanlike manner. If the insured subsequently claims, based upon a written estimate which he obtains, that necessary repairs will exceed the written estimate prepared by or for the company, the company shall review and respond promptly to the insured and provide the insured with the name of a repair shop that will make the repairs in a workmanlike manner. Failure of the company to so inform the insured of the name of such a repair shop shall require the company to provide written notice to the insured that any and all reasonable costs incurred for repair or replacement related to the partial loss in excess of the company's estimate will be reimbursed by the company. The company shall maintain

27

documentation of all such communications."  50 Ill. Admin. Code ç919.80(d)(6).

In *Chatham Corp.*, the plaintiff was a company that sterilized medical equipment at a plant in Virginia.  *Chatham Corp.*, 351 Ill. App. 3d at 354.  When an explosion severely damaged the plaintiff's plant, it turned to its insurance carrier, the defendant, for relief under its policy, which included the provision that the defendant would pay the plaintiff the "necessary expenses you incur during the period of restoration."  *Chatham Corp.*, 351 Ill. App. 3d at 355. The defendant then paid for the reconstruction of the plaintiff's plant, but refused to pay for a portion of the expenses the plaintiff incurred in its efforts to maintain the business relationship it had with its main customer, a corporation known as Maxxim Medical, Inc.  *Chatham Corp.*, 351 Ill. App. 3d at 355.  The business contract the plaintiff had with Maxxim called for the plaintiff to find alternate sterilization facilities and to pay the cost of shipping Maxxim's unsterilized goods from the plaintiff's facility to an alternate sterilization facility.  *Chatham Corp.*, 351 Ill. App. 3d at 355.  The defendant recognized the plaintiff's obligation under the Maxxim contract as "necessary" and reimbursed the plaintiff for the expense of shipping the goods between the facilities.  *Chatham Corp.*, 351 Ill. App. 3d at 355.  When the plaintiff looked to the defendant for reimbursement for the expense it incurred by shipping the newly-sterilized goods to Maxxim's customers, the defendant refused to pay, deeming that cost

28

"unnecessary." *Chatham Corp.*, 351 Ill. App. 3d at 355.

After proceedings in federal court in Virginia, the plaintiff filed a complaint in Illinois, alleging, among other things, breach of contract. *Chatham Corp.*, 351 Ill. App. 3d at 356. After the trial court granted summary judgment in favor of the defendant, the plaintiff appealed and this court affirmed, finding that "necessary" was not an ambiguous term, that it does not encompass expenses that insureds may have wanted to incur on a voluntary basis, and that a court cannot add terms to a contract which the parties have not included in the language of the policy. *Chatham Corp.*, 351 Ill. App. 3d at 358-59. See also *Butwin Sportswear Co. v St. Paul Fire & Marine Insurance Co.*, 534 N.W.2d 565 (Minn. App. 1995) (an appraiser's fee is not a "necessary" expense that an insurer is obligated to reimburse; "necessary" is not ambiguous).

*Smith* provides a good example of an insurance policy provision that violated public policy. In *Smith*, the defendant passenger was injured when her vehicle, being driven by a valet parking attendant of a casino, rolled backward as she (the defendant) was getting into the car. *Smith*, 197 Ill. 2d at 370. The insurance policy in question in *Smith* contained an exclusion, which stated that there was no coverage for vehicles being used by any person employed or engaged in any way in a car business. *Smith*, 197 Ill. 2d at 372-73. The plaintiff, the defendant's insurance company, then moved for a declaratory judgment that it had no duty to defend the casino based on an "automobile business" exception in the defendant's policy. *Smith*, 197 Ill. 2d at 371. The trial court held

29

that the automobile business exclusion applied, and that the plaintiff had no duty to defend or indemnify the casino. *Smith*, 197 Ill. 2d at 371. Accordingly, the trial court granted the plaintiff's motion for summary judgment. *Smith*, 197 Ill. 2d at 371.

On appeal, this court reversed, finding that the "business exclusion" provision violated the Illinois rule that a liability insurance policy issued to the owner of a vehicle must cover the named insured and any other person using the vehicle with the named insured's permission and, therefore, was against public policy. *Smith*, 197 Ill. 2d at 372. On further appeal, the supreme court affirmed this court, holding that the automobile business exclusion violated the public policy of Illinois, namely, by violating established case law and a section of the Vehicle Code. *Smith*, 197 Ill. 2d at 374. In its holding, the supreme court adhered to its rule of not establishing public policy which is contrary to the public policy that the Illinois legislature has deemed appropriate for the State of Illinois. *Smith*, 197 Ill. 2d at 376.

As discussed above, the POL provision of the policy in the instant case is rendered irrelevant if it can be shown that defendant fulfilled its "amount necessary" obligation. Plaintiff's initial effort to ensure that this court's interpretation of section 919.80(d)(6) of the Department of Insurance Regulations conforms with the finding in *Howard* regarding POL provisions, then, should also be classified as immaterial pending a recommendation on the "necessary" clause.

Although the trial court here looked to a federal case for its ruling on the term "necessary," we have no need to look any further

than this district. The *Chatham Corp.* court was clear in labeling "necessary" as an unambiguous term meaning essential, indispensable, or requisite. It is apparent from the facts of this case that it was not "essential" that plaintiff's vehicle be repaired at West Loop. There were several other body shops that could have done the job, including defendant's two DRP shops that plaintiff's attorney admitted, in court, would have done the job in a workmanlike manner.

It is important to note that, as defendant points out, the policy language in *Chatham Corp.* refers to "necessary expenses *you* incur," with "you" clearly referring to the insured. (Emphasis added.) *Chatham Corp.*, 351 Ill. App. 3d at 355. In this case, the policy language states "the Company's limit of liability for all losses *** shall not exceed *** (b) the amount necessary to repair the damaged property." Illinois case law that has held that policy language is meant to express the intention of the parties compels this court to find that the "amount necessary" refers to the amount the *insurer* must spend to repair the vehicle, not the amount the insured decides to spend. Indeed, such an open-ended clause would, as defendant argues, benefit only the high-rate body shops. See *Chick's Auto Body v. State Farm Mutual Automobile Insurance Co.*, 168 N.J. Super. 68, 401 A.2d 722 (N.J. Super. L. 1979) (the practice of insurance companies to calculate reimbursement of insureds based upon lowest prevailing price in marketplace (and to insure integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition). In

fact, with the *Mockmore* rule in effect, compelling all insurers to assume all liability for repairs made at body shops they chose, it is unclear how the policy interpretation plaintiff is arguing for would protect insureds at all. See *Williams v. Farm Bureau Mutual Insurance Co. of Missouri*, 299 S.W.2d 587 (Mo. App. 1957) (if the insurer's chosen shop performs shoddy work, then the insured is entitled to damages; no claim, however, arises from mere speculation that the work promised by insurer would not suffice).

It follows then, if the amount "necessary" to repair the vehicle is the amount *defendant* would need to spend to have the vehicle repaired, then a "reasonable estimate" is one reflecting the *defendant's* potential costs, not what the insured would incur if she were negotiating on her own. Accordingly, we find that "reasonable estimate" is not an ambiguous term and was not grounds for denial of summary judgment here.

In *Smith*, the statute and case law presented by the defendant supported a successful argument that the policy language at issue was against public policy. In the instant case, plaintiff has not provided any such support for her argument. It should also be noted that, as evidenced by the legislature's decision not to enact House Bill No. 1502, Illinois has found the very practice defendant implements in this case to not be against public policy. This is also illustrated in the Department of Insurance letter to plaintiff and the instructions posted on the Department of Insurance's website.

With respect to section 919.80(d)(6) of the Department of Insurance Regulations, the record here is clear that defendant complied with each aspect of the section. Defendant supplied plaintiff with a copy of its estimate, which can accurately be considered "reasonable" in light of the analysis above, and provided plaintiff not only with a list of shops where she could have her vehicle repaired for the total listed on that estimate but also with the offer of a free tow and storage.

Accordingly, we find that the trial court correctly interpreted the policy, that there were no ambiguous terms on which to deny summary judgment for defendant, and that the policy language was not against public policy.

### DiLisio's Testimony

Plaintiff contends that the trial court abused its discretion in striking DiLisio's testimony and that the court's own comments reveal the deficiency in its judgment. Specifically, plaintiff points to the statement of the trial court that "Mr. DiLisio is certainly qualified to talk about repair costs, and given an appropriate amount of homework I suppose he might be qualified to talk about Chicagoland repair costs." Plaintiff contends that this statement shows that the perceived deficiencies in DiLisio's research would have gone only to the weight, not the sufficiency, of his opinions.

Plaintiff contends that, because the trial court was supposed to consider all of the evidence of record in determining whether a

33

factual controversy existed between the parties, but not weigh the testimony of one deponent against another or make any credibility determinations, it abused its discretion in refusing to consider DiLisio's testimony because of a perceived deficiency in the number of shops which he called to form his opinion.

Defendant contends that DiLisio's affidavit is irrelevant and immaterial because it exercised its option to repair plaintiff's car and, as such, was not bound to any specific rates, but rather only to repairing her car in a workmanlike manner. Defendant argues that the trial court properly struck DiLisio's testimony because there was no factual basis for his opinion. To illustrate its contention, defendant points out that DiLisio did not randomly select the shops he called, but rather personally selected shops from an incomplete list of shops he compiled for unspecified reasons.

In addressing plaintiff's contention that the deficiencies in DiLisio's testimony should only affect the weight, but not the admissibility of the evidence, defendant argues that the qualifications of an expert/opinion witness must be established before he may give any opinion testimony. In support of its argument, defendant maintains that DiLisio had no statistical training and did not claim that his five telephone calls, which posed only one question to shop owners he already knew, produced any statistically reliable result. Defendant contends that this "survey" was flawed, both for its size and for lack of appropriate questions, and that the trial court did not abuse its discretion by

34

striking it.

A ruling on the admissibility of expert testimony will not be reversed absent an abuse of discretion. *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 937, 738 N.E.2d 199 (2000). Testimony is irrelevant and properly excluded if it has no legitimate bearing on any fact or issue in the case. *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 559, 411 N.E.2d 217 (1980).

Defendant is correct in its argument that the labor rates charged by West Loop and the shops in its DRP are irrelevant to this case. As established above, defendant fulfilled its obligation to plaintiff by making arrangements to repair her car with no expense to her beyond her deductible. It should be noted that, although the trial court struck DiLisio's affidavit because it found it to be based on insufficient facts, we need not address that decision because the issue of labor rates is irrelevant. The opinion of DiLisio as to the reasonableness of any labor rates has no bearing on the central issue of this case and, as a result, there is no need to analyze either his testimony or the court's striking of his affidavit. Accordingly, we find that, although the trial court struck DiLisio's affidavit for a different reason, the court did not abuse its discretion in striking the affidavit.

## Section 155 of the Insurance Code

Plaintiff contends that the trial court abused its discretion in granting defendant summary judgment on plaintiff's claim under section 155 of the Insurance Code (Code) (215 ILCS 5-155 (West

2000)). Plaintiff argues that she presented sufficient facts to support her claim that defendant acted unreasonably and vexatiously in the handling of her loss. Plaintiff states again that defendant's interpretation of the POL provision would "force policyholders like [her] to either accept less than what they were due under the policy if they had their vehicles repaired at a body shop of their choice or to assume the risk of having their vehicles repaired at body shops selected by the insurer without any assurance" guaranteeing the success of the repairs. Plaintiff further contends that defendant denied significant portions of her claim based on its use of labor rates that it knew did not reflect the objectively reasonable cost of those services in the marketplace, but, rather, reflected only the discounted rates it had negotiated with its DRP shops.

Defendant counters that it did not act unreasonably, as evidenced by its compliance with the terms of the policy, section 919.80(d)(6) of the Department of Insurance Regulations, and the Department of Insurance website. Defendant maintains that it promptly offered to tow and repair plaintiff's vehicle for the amount of its estimate at any of its DRP shops and that any delay in processing was due to plaintiff's own refusal to allow defendant to repair the vehicle. Defendant then notes that it complied with section 919.80(d)(6) of the Department of Insurance Regulations by promptly providing plaintiff with the name of a shop that would honor its estimate. Defendant further argues that, in fact, it

provided plaintiff with the names of all the shops in its DRP, including two that were very close.

Defendant also argues that the dispute at issue is a bona fide coverage dispute and, as such, is not the type of dispute section 155 of the Code is designed to remedy. Defendant notes that plaintiff has not cited a single case awarding costs and sanctions under section 155 of the Code where the policy gave the insurer the option to repair or pay for repairs to an insured's vehicle, the insured refused the insurer's proffered repair of the vehicle, and the insurer then promptly paid the insured the cost of the insurer's repairs.

Section 155 of the Code provides, in pertinent part, for the award of attorney fees in cases where the insurer caused an unreasonable delay in settling a claim, and it appears to the court that such action or delay was vexatious and unreasonable. *Mobil Oil Corp. v. Maryland Casualty Co.*, 288 Ill. App. 3d 743, 751-52, 681 N.E.2d 552 (1997). "A court should consider the totality of the circumstances when deciding whether an insurer's actions are vexatious and unreasonable. Factors to consider are the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property. If a bona fide dispute existed regarding the scope of the insurance coverage, an insurer's delay in settling the claim may not violate section 155." *Valdovinos v. Gallant Insurance Co.*, 314 Ill. App. 3d 1018, 1021, 733 N.E.2d 886 (2000). "While the question of whether the insurer's action and delay is vexatious and unreasonable is a factual one, it is a matter for the discretion of the trial court; the trial court's determination will not be disturbed

37

unless an abuse of discretion is demonstrated in the record." *Dark v. United States Fidelity & Guaranty Co.*, 175 Ill. App. 3d 26, 30-31, 529 N.E.2d 662 (1988).

In *Valdovinos*, which plaintiff here relies on, the plaintiff insured was involved in an automobile accident and filed a timely claim with the defendant, his insurer. *Valdovinos*, 314 Ill. App. 3d at 1019. The *Valdovinos* plaintiff hired an independent appraiser to estimate the damage to his vehicle and then sent the estimate to the defendant, who told the plaintiff that it would process the claim. *Valdovinos*, 314 Ill. App. 3d at 1019. The defendant then failed to communicate with the plaintiff for two months despite the plaintiff's efforts to make contact, including calling the defendant over 20 times. *Valdovinos*, 314 Ill. App. 3d at 1019. During these two months, the plaintiff was forced to borrow money for alternative transportation and to repair his vehicle. *Valdovinos*, 314 Ill. App. 3d at 1020. When the defendant finally did communicate with the plaintiff, it did so by submitting a "counteroffer" that was several thousand dollars lower than his submitted estimate, with no explanation for the differing estimate amounts. *Valdovinos*, 314 Ill. App. 3d at 1022. The plaintiff then was forced to take legal action, and incur the accompanying expenses and fees. *Valdovinos*, 314 Ill. App. 3d at 1022. At trial, the trial court awarded the plaintiff his claimed expenses, but denied his petition for fees and costs under section 155 of the Code. *Valdovinos*, 314 Ill. App. 3d at 1019. On appeal, the *Valdovinos* court reversed, noting the defendant's delay in processing the claim and its lack of

38

communication and finding that there was no bona fide dispute over the cost of repairs. *Valdovinos*, 314 Ill. App. 3d at 1022. The case was then remanded to the trial court with directions to award the plaintiff fees and costs under section 155 of the Code. *Valdovinos*, 314 Ill. App. 3d at 1023.

In contrast to the defendant in *Valdovinos*, defendant's efforts at communication in this case were prompt and numerous. It is undisputed that defendant's representatives spoke with plaintiff on the telephone at least four times in the first few weeks following the accident. There is also no evidence that defendant failed to fully and completely explain the limits of plaintiff's policy to her. Also, unlike *Valdovinos*, the amount to be paid on the estimate was in dispute at all times in this case. Further, there is no evidence that plaintiff had to initiate a lawsuit just to receive the benefits of her policy, as the offer to fix her car without additional cost was made several times. The cost-inducing delay in this case was not caused by the same type of operational breakdown apparent in *Valdovinos*. Whether the delay was caused by defendant's refusal to pay the rates charged by West Loop or plaintiff's refusal to allow her car to be repaired at one of defendant's DRP shops, the dispute can be classified as bona fide. As a bona fide dispute, then, defendant's delay in "settling the claim," such as it was, cannot be considered vexatious or unreasonable. Accordingly, we find that the trial court did not abuse its discretion in denying the award of attorney fees and costs under section 155 of the Code.

Class Action Treatment Under Section 155 of the Code

Plaintiff contends that the trial court erred in ruling that the pleadings precluded class action treatment for the claims asserted under section 155 of the Code. Plaintiff argues that class action treatment is proper, and has been shown to be proper by case law, when an insurer uses an arbitrary and unreasonably low payment schedule to deny legitimate claims. Plaintiff maintains that defendant has a regular policy and practice of rejecting all or part of legitimate physical damage claims without regard to the fees actually charged by repair shops within the applicable geographic location. In this case, plaintiff argues, the dominant and persuasive issue is one of contract interpretation, specifically, whether defendant breaches its contract with its insureds each time it purports to pay a physical damage claim in money but limits such payment to an arbitrary and unreasonable amount based on the use of discounted labor rates charged by the shops that participate in its DRP. As such, plaintiff contends that her case is precisely the type of case that is suitable for class action treatment.

Defendant contends that the trial court's dismissal of plaintiff's claim for class action relief was proper because that claim was not supported by either the facts or the law. Defendant notes that plaintiff's argument that "a number of cases" approve class action status for claims under section 155, "alleging that an insurer uses an arbitrary and unreasonably low payment schedule to deny legitimate claims," is not supported by a single case.

Defendant further contends that a section 155 class action in this case would require an examination of all the factors and considerations that go into automobile damage estimates prepared by a myriad of body shops and adjusters. Defendant maintains that common sense and experience show that there are variations in every estimate and that, were a class action to be granted, the court would have to hold a trial for each individual claim to determine the bona fides of both the repair shop's and the adjuster's estimate. The trial court would also, argues defendant, have to determine whether the damages claimed from each accident to each vehicle were legitimate or fraudulent. Such a trial to determine all of those important issues separately for each individual claim, defendant contends, would be so unwieldily as to defeat the purpose of a class action.

"Dismissal of a cause of action on the pleadings is only proper where it is clearly apparent that plaintiff can prove no set of facts that would entitle him to recover. In ruling on a motion to dismiss pursuant to Ill. Rev. Stat. ch. 110, para. 2-615 (1991), the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences that can be drawn therefrom. The court reviews a ruling on a motion to dismiss *de novo*." *Sherman v. Kraft General Foods Inc.*, 272 Ill. App. 3d 833, 835-36, 651 N.E.2d 708 (1995). Where a predominant and common question of law or fact exists, requirement of individual proofs, or multiple claims requiring separate adjudication, do not bar class actions. *Puritt*

*v. Allstate Insurance Co.*, 284 Ill. App. 3d 442, 447, 672 N.E.2d 353 (1996).

In *Puritt v. Allstate Ins. Co.*, 284 Ill. App. 3d 442, 443, 672 N.E.2d 353 (1996), which plaintiff relies on, the plaintiff was an insured who was injured in an automobile accident and was dissatisfied with the amount her insurer, the defendant, paid for her medical expenses. Consequently, the plaintiff filed a lawsuit for individual and class action relief, alleging that the defendant implemented a practice of rejecting all or part of legitimate medical claims by using a payment schedule that was unreasonably low and arbitrarily set. *Puritt*, 284 Ill. App. 3d at 443. Prior to trial, the trial court granted the defendant's motions to dismiss the complaint, contending that the plaintiffs lacked standing and that the action was not proper for class certification. *Puritt*, 284 Ill. App. 3d at 443. In making its decision, the trial court relied on case law that found class actions inappropriate for purported classes that were dependent on "intervening factors," *i.e.,* a group of insureds cannot be a class simply because they "may" get into an accident and be denied coverage. *Puritt*, 284 Ill. App. 3d at 447.

On appeal, the *Puritt* court found that the trial court erred and defined the purported class as consisting of the defendant's insureds who had been involved in an automobile accident, were injured, received medical treatment for which they submitted claims under the medical payments provisions of their policies, and were tendered less than the amounts billed based on the defendant's

alleged policy and practice of depriving its insureds of reasonable payments on their medical claims. *Puritt*, 284 Ill. App. 3d at 447. In vacating the order to dismiss the class action count, the *Puritt* court explained that instead of an "intervening factor" class action, the plaintiff had introduced a "common issue of contract interpretation." *Puritt*, 284 Ill. App. 3d at 447. The *Puritt* court was deliberate in explaining that it was not deeming a class action appropriate, but rather that it found that the trial court relied on the wrong type of cases in making its determination. *Puritt*, 284 Ill. App. 3d at 447. See also *Van Vactor v. Blue Cross Ass'n*, 50 Ill. App. 3d 709, 721, 365 N.E.2d 638 (1977) (class action upheld where allegation was that the insurer violated contracts with the insureds by denying benefits solely on the ground that it disagreed with honest judgment of treating doctors on need for medical services).

Applying the reasoning underlying *Puritt* and *Van Vactor* to this case, then, results in a finding that the only way a class action could have survived a motion to dismiss is if the class members were found to be joined by a common issue of contract interpretation and victims of the "scheme" that plaintiff has alleged defendant implements. It follows, then, that absent a finding of any "scheme," there can be no class of victims. In accordance with our finding that there was no "scheme," we therefore affirm the trial court's denial of class action treatment of plaintiff's claim under section 155 of the Code.

## CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

GORDON and McBRIDE, JJ., concur.