KELLY ASSOCIATES, LTD., Petitioner,

v.

The AETNA CASUALTY AND SURETY
COMPANY, Respondent.

No. C–2794.

Supreme Court of Texas.

July 11, 1984.
On Rehearing Oct. 31, 1984.

Bankston, McDowell & Olivier, D. Craig Olivier and John T. McDowell, Houston, for petitioner.

Fulbright & Jaworski, Osborne J. Dykes and Roger Townsend, Houston, for respondent.

McGEE, Justice.

This is a summary judgment case involving the interpretation of certain terms in a stockbroker's blanket fidelity bond. Kelly Associates, Ltd., sued its insurer, the Aetna Casualty and Surety Company, after Aetna refused payment on a claim made under Kelly's blanket bond. Both parties moved for summary judgment. The trial court denied Kelly's motion and granted Aetna's motion that Kelly take nothing by its suit. The court of appeals affirmed the trial court judgment. 662 S.W.2d 777. We reverse the judgments of the courts below.

Prior to September 25, 1981, Kelly Associates, Ltd., a limited partnership organized pursuant to the Texas Uniform Limited Partnership Act, Tex.Rev.Civ.Stat.Ann. art. 6132a (Vernon 1970), conducted business as a discount stock brokerage. The partnership consisted of two general partners and eleven limited partners. Kelly leased office spaces in Houston, Dallas, and Austin, and employed approximately 80 workers.

Kelly was insured under a stockbroker's blanket bond issued by Aetna, which protected Kelly from the misappropriations of its employees. The bond covered only those losses discovered during the policy period. The bond, issued by the insurance company, was a printed form contract which contained the following standard provision:

> This bond shall be deemed terminated or cancelled as an entirety ... immediately upon the taking over of the Insured by another business entity.

On September 25, 1981, Kelly's general partners, with the authorization of the limited partners, executed a "Purchase Agreement" and "General Conveyance, Bill of Sale and Assignment", the effect of which was to transfer a good part of the assets and business of Kelly to Fidelity Brokerage Services, Inc., a Massachusetts firm.

Two months later, on November 27, 1981, Kelly discovered that a former employee had fraudulently misappropriated roughly $200,000. Kelly notified Aetna of its discovery but Aetna rejected the claim on grounds that the September 25th transaction constituted a takeover of Kelly by Fidelity, terminating the bond. The sole

question raised by Aetna's motion for summary judgment and Kelly's response is whether, on the November 27th discovery date, Kelly had been "taken over" within the meaning of the termination clause. The answer to this question depends upon the construction of the words "taking over."

The contract by which Kelly undertook to sell its business to Fidelity provided for a conversion process to begin September 25th, the "Closing Date." The process was to extend through a "Closing Period" during which time Kelly's accounts were to be submitted to Fidelity for their acceptance or rejection, and was to end on the "Closing Completion Date" of June 25, 1982. The accompanying General Conveyance provided for the transfer of "All of the Subject Business of [Kelly]," all Kelly's accounts, except those rejected by Fidelity, and all of Kelly's "privileges, franchises and records." Fidelity acquired all of Kelly's furniture, fixtures, computers, records, leases, rental agreements, the right to Kelly's name, trademarks, goodwill, and some of its customer accounts.

Several indices of "doing business," however, existed on behalf of Kelly subsequent to September 25, 1981. For example, Kelly retained all preexisting expenses and liabilities. It retained entitlement to all revenues from transactions made prior to September 25th and from accounts not accepted by Fidelity. As of September 25, Kelly retained membership in the New York Stock Exchange and National Association of Securities Dealers (NASD). According to Kelly, it retained 1.1 million dollars of its liquid assets after the sale, totalling some 73 percent of Kelly's book value assets as of the sale date. One of the two general partners testified that Kelly had only transferred 27 percent of its total assets to Fidelity. Kelly also retained all of its automobiles.

■ The Kelly limited partnership continued to operate as "Kelly Associates Ltd." after September 25, 1981, and used the same letterhead and phone number it had prior to that date. After the sale of the business, Kelly released all of its employees, many of whom began work on Fidelity's payroll, and resigned its stock exchange memberships. It is apparent from the deposition of general partner Lawrence Kelly that the partnership was, at the time of this litigation, in its winding-up stages. Although the contract provided that during the closing period, "Kelly will continue to operate the business of Kelly relating to the Accounts, subject in all respects to direction and control by [Fidelity]," this provision is not of controlling importance. This is because a subsequent provision in the contract states: *"[t]he foregoing notwithstanding, ... Kelly shall be responsible for expenses and liabilities incurred, and shall be entitled to revenues (a) relating to the period prior to the Closing Period, (b) relating to any Causally Rejected Accounts, and (c) relating to all transactions effected during the period on or prior to the Closing Date."* (emphasis added). Therefore, Kelly was not subject to the direction and control of Fidelity in all respects and, in particular, was not subject to Fidelity's control as to the winding-up phase of its business.

■ Takeover clauses such as the one in issue are standard in bankers' and brokers' bonds, but have received little scrutiny by either the courts or commentators. We have found no Texas case that has construed the words "taking over" or "takeover" in an analogous fact situation. In its ordinary meaning, "takeover" means "to assume control or possession of" or to "succeed to the management of." Webster's Third New International Dictionary 2332 (1961); *see also* Black's Law Dictionary 1304 (5th ed. 1979). The case of *National Union Fire Insurance Co. v. Young*, 199 So.2d 70 (Miss.1967), involved a termination clause similar to the one at bar. A corporate takeover was found to occur where all the stock and assets of the insured corporation were transferred to another corporation. Since the right to participate in management is one of the property rights inherent in the general partners, a takeover in the corporate sense, by

acquisition of a controlling number of voting shares, is not possible in a partnership.

■ The interpretation of the takeover clause is a question of law for the court. *See, e.g., Standard Fire Insurance Co. v. Griggs,* 567 S.W.2d 60 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.); *Maryland Casualty Co. v. Golden Jersey Creamery,* 389 S.W.2d 701 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.); *Home Insurance Company v. Enloe,* 287 S.W.2d 235 (Tex.Civ.App.—Amarillo 1956, writ ref'd n.r.e.). In the instant case, the parties disagree as to the meaning of the word "takeover" in the context of the insurance policy. Kelly asserts that when the insured entity is a partnership, a takeover can only occur when the partnership is completely terminated, its partners disbanded, and its business wound up and transferred to another entity. In response, Fidelity argues that termination is not a necessary predicate to a takeover and that a takeover may occur with the sale of the partnership's business.

■ The case of *Ramsay v. Maryland American General Insurance Co.,* 533 S.W.2d 344 (Tex.1976), is analogous to the case at bar. In *Ramsay,* this court was confronted with the interpretation of a term used in an insurance policy. The parties agreed that a term used in the exclusionary clause of an insurance policy had a plain and generally accepted meaning but, as here, disagreed as to what that meaning was. This court concluded that while the term "commercial automobile" was normally unambiguous, ambiguity existed because the term was susceptible to more than one reasonable construction. We held that:

> It is a settled rule that policies of insurance will be interpreted and construed liberally in favor of the insured and strictly against the insurer, and especially so when dealing with exceptions and words of limitation.... When the language of a policy is susceptible of more than one reasonable construction, the courts will apply the construction which favors the insured and permits recovery.

*Id.* at 349. Again, in the case of *Glover v. National Insurance Underwriters,* 545 S.W.2d 755 (Tex.1977), this court was faced with the interpretation of an ambiguous term used in an insurance contract. In *Glover,* we held that:

> [W]e must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. (citations omitted)...
>
> [T]he plain language of an insurance policy, like that of any other contract, will be given effect when the parties' intent may be discerned from that language. But when the language of an insurance contract is ambiguous, that is, is subject to two or more reasonable interpretations, then that construction which affords coverage will be the one adopted.

*Id.* at 761. These same rules of insurance contract construction were adhered to in *Continental Cas. Co. v. Warren,* 152 Tex. 164, 254 S.W.2d 762, 763 (1953); *Providence Washington Ins. Co. v. Proffitt,* 150 Tex. 207, 239 S.W.2d 379, 381 (1951); *Lloyd's Casualty Insurer v. McCrary,* 149 Tex. 172, 229 S.W.2d 605, 609 (1950); *United Service Automobile Ass'n v. Miles,* 139 Tex. 138, 161 S.W.2d 1048, 1050 (1942); *see also Insurance Company of North America v. Cash,* 475 S.W.2d 912, 915 (Tex.1971). We find the authority of these cases to be persuasive. Since the term "takeover" in the instant case was susceptible to more than one reasonable construction, we are compelled to apply the construction favoring the insured and permitting recovery.

■ Furthermore, Kelly could reasonably expect that the bond coverage would extend through the winding-up phase of its business. This was a period in which its affairs were in a state of flux and in which it was as susceptible to employee misappropriation as it was at any other time. Dissolution, winding-up, and termination are distinct phases of a partnership's existence. Tex.Rev.Civ.Stat.Ann. art. 6132b, § 30

(Vernon 1970). Dissolution does not necessarily terminate the partnership business. As stated in *Woodruff v. Bryant*, 558 S.W.2d 535 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.), "[e]ven if the business is to be discontinued, the partnership continues to exist, at least for the limited purpose of winding up. It is only upon termination that the final partnership relationship ceases to exist." *Id.* at 539. There was no assignment of partnership rights or interests, nor any admission of new partners to the Kelly limited partnership. The same individuals remain in control of the partnership, in its winding-up stages, as did prior to the sale.

■ While the business of Kelly Associates, Ltd. was effectively transferred to Fidelity, the partnership continues its existence for the purpose of winding up its affairs, which include the fulfillment of its remaining obligations under the sales contract and the collection and distribution of assets to the partners. These functions remain under the sole management of the partners and have not been taken over by Fidelity. The partnership could be victimized by employee misappropriations during winding up just as it could prior to dissolution. We interpret the insurance contract to extend coverage through the winding-up phase of the limited partnership.

The judgments of the courts below are reversed and judgment is rendered that Kelly recover under the terms of the blanket fidelity bond.

ROBERTSON, J., dissents with opinion in which POPE, C.J., and SPEARS, J., join.

ROBERTSON, Justice, dissenting.

I respectfully dissent. The summary judgment evidence in this case reveals that Kelly Associates, Ltd., was in its winding-up stages when its employee's malfeasance was discovered. Control of the partnership's business had been transferred to Fidelity, the acquiring company, two months prior to discovery. Kelly's insurance policy clearly stated that it covered losses sustained at any time *but discovered during the policy period,* and just as clearly provided that the policy would terminate upon Kelly's being taken over by another business entity. Therefore, Kelly's right to recover under the policy hinges on whether the September 25, 1981 transaction was a takeover.

As the majority recognizes, the common meaning of the word "takeover" focuses on continuity of management. *First National Life Insurance Company v. Fidelity & Deposit Company*, 525 F.2d 966, 969 (5th Cir.1976). Kelly's stock brokerage business was placed entirely under the direction and control of Fidelity, leaving behind a skeletal legal entity whose only purpose was to disburse its remaining assets to the former partners. Despite this relinquishment of control, the majority holds that management was continuous, and that the partnership was not taken over.

The majority states that several indices of "doing business" existed after the acquisition by Fidelity on September 25, 1981. We do not find in the evidence any indication that Kelly continued to do business "as a broker-dealer in the securities business", the purpose for which the partnership was formed.

After the sale of the business on September 25th, Kelly released all its employees, many of whom began work on Fidelity's payroll. Some 30,000 customer accounts were transferred to Fidelity, less than 50 "problem accounts" were retained. General partner Lawrence Kelly stated in his deposition that the only task remaining to be done on behalf of the partnership was to complete the few remaining account transfers to Fidelity and distribute the remaining sale proceeds to the partners, 95% of which had already been distributed. In various communications the general partners referred to the transaction of September 25th as an "acquisition" of Kelly by Fidelity, and the "sale ... of all the assets and business of Kelly Associates, Ltd." In its notice of discovery of loss sent to Aetna on December 17, 1981, Kelly stated that on September 25th it had "sold all its assets to Fidelity Brokerage Services, Inc." The em-

ployment and noncompetition agreement which general partner Lawrence Kelly signed on September 25th recognizes that Fidelity "proposes to continue to engage in the business heretofore run by [Kelly]."

The fact that Kelly remained a member of the New York Stock Exchange and NASD for a brief period following the takeover is of no significance whatsoever: no business was done by the partnership under its memberships, and the memberships were quickly resigned. The retention of certain cash assets on Kelly's ledgers after the takeover by Fidelity is also irrelevant. What matters is that the business of Kelly Associates, Ltd., was transferred to Fidelity and placed under its control.

The employee thefts for which Kelly seeks coverage occurred both before and after the September 25th takeover. However, Kelly only seeks recovery for thefts occurring before the takeover. Fidelity filed a claim with its insurer (Fireman's Fund) for all post-takeover thefts, and recovered its losses. I consider this further evidence that the September 25th transaction was a takeover.

I agree that where terminology is in dispute, the accepted rules of insurance policy construction compel us to adopt the insured's interpretation, so long as that construction is reasonable. *Glover v. National Insurance Underwriters*, 545 S.W.2d 755, 761 (Tex.1977). Kelly argues that takeover within the meaning of this policy means "complete takeover." Kelly argues that under the facts of this case, the partnership would not be taken over until the partnership completely terminated. This construction is unreasonable. Partnerships are capable of change and reformation, including change in management, without termination.

In this case, the entirety of the partnership's business has been transferred to another business entity, in a transaction which simultaneously placed the managing partners under the control of that entity and prevented the original partnership from continuing existence for any other purpose than to wind up its affairs and terminate. The termination clause at issue became effective upon the taking over of the insured, not upon its termination. I would affirm the judgments of the courts below finding that as a matter of law the sale on September 25, 1981, constituted a taking over of Kelly Associates, Ltd., by Fidelity within the meaning of the bond.

POPE, C.J., and SPEARS, J., join in this dissenting opinion.

## ON MOTION FOR REHEARING

McGEE, Justice.

Aetna, in its motion for rehearing, correctly points out that this case should be remanded to the trial court.

Both parties moved for summary judgment in the trial court. Although Kelly has assigned as error the granting of Aetna's motion for summary judgment, it has not properly preserved the error of the trial court in failing to grant its motion for summary judgment. The amount of damages also must be determined. Therefore, we cannot render judgment, but must remand the case to the trial court. *Gulf, Colorado & Santa Fe Ry. v. McBride*, 159 Tex. 442, 322 S.W.2d 492 (1958); *Farah Mfg. Co. v. Continental Airlines, Inc.*, 524 S.W.2d 815 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.).

Respondent's motion for rehearing is granted in part. The judgments of the courts below are reversed and the cause is remanded to the trial court.

GONZALEZ, J., not sitting.