### RIMKUS CONSULTING GROUP, INC., et al, Plaintiff,

v.

### HARTFORD CASUALTY INSURANCE COMPANY, Defendant.

#### Civil Action No. H–07–176.

United States District Court, S.D. Texas, Houston Division.

Aug. 30, 2007.

Robert H. Etnyre, Jr., Royston Rayzor et al, Houston, TX, for Plaintiff.

Christopher W. Martin, Martin R. Sadler, Patrick Michael Kemp, Martin Disiere et al, Houston, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

KENNETH M. HOYT, District Judge.

## I. Introduction

Pending before the Court are the competing motions for summary judgment of the plaintiffs, Rimkus Consulting Group, Inc., and Rimkus Consulting Group, Inc. of Louisiana (hereinafter, "Rimkus"), and of the defendant, Hartford Casualty Insurance Co. ("Hartford"). Having considered the motions, summary judgment evidence, and applicable authorities, the Court determines that Rimkus' motion for partial summary judgment is granted as to its claim for extra expenses and statutory damages, but otherwise denied; and, that Hartford's motion is granted as to business income loss and additional expenses, but otherwise denied.

## II. Background

Rimkus consists of two Texas corporations with their principal places of business located in Houston, Texas. They provide engineering, accounting, and consulting services in several cities, including New Orleans, Louisiana. Hartford is an Indiana corporation with its principal place of business located in Connecticut. Hartford is an insurer that is authorized to, and does, conduct business in the state of Texas.

The facts in this case are largely undisputed. Hartford issued insurance policy No. 61 UUN UV8762 to Rimkus for the period of November 27, 2004 to November 27, 2005. The policy includes coverage for losses, including extra expenses, due to business interruption. The policy provides, in relevant part,

### A. Coverage

We will pay up to the Special Business Income Limit of Insurance stated in the Property Choice Declarations for the actual loss of Business Income you sustain and the actual, necessary and reasonable Extra Expense you incur due to the necessary interruption of your business operations during the Period of Restoration due to direct physical loss of or direct physical damage caused by or resulting from a Covered Cause of Loss to property at "Scheduled Premises". [sic]

If you are a tenant, this coverage applies to that portion of the building which you rent, lease or occupy, and extends to common service areas and access routes to your area.

The policy defines "Business Income" as "the Net Income (Net Profit or Net Loss before income taxes), including Rental Income, that would have been earned or incurred; and [c]ontinuing normal operating expenses incurred, including payroll." "Extra Expense" is "the necessary and reasonable additional expenses [the insured] incur[s] during the Period of Restoration that exceed the normal expenses that [the insured] would have incurred if there had been no direct physical loss or no direct physical damage to property caused by ... a Covered Cause of Loss." Hartford agreed to pay Extra Expenses to "[a]void or minimize the interruption of business and to continue business operations at the insured premises or at temporary locations, including relocation expenses and costs to equip and operate a temporary location." In addition, the policy defines the "Period of Restoration" as the "period of time that [b]egins at the time the Covered Cause of Loss occurred; and [e]nds ... [on the] date when business is resumed at a new permanent location."

In determining the amount of loss, the policy states that "Business Income" is to be determined by, among other things:

(1) The Net Income of the business before the direct physical loss or direct physical damage occurred;

(2) The likely Net Income of the business if no physical loss or no physical damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses.

Finally, the policy includes a provision that allows Hartford to reduce amounts payable to the "extent that the reduction in volume of business income from the affected income channel is offset by an increase in the volume of business from other income channels."

In August of 2005, Hurricane Katrina struck New Orleans and Rimkus' office building was damaged and forced to close. Rimkus, however, continued to provide services. In fact, as a result of the devastation unleashed by Katrina, Rimkus saw its revenues increase substantially in the months after the storm hit.[1] To continue providing services, however, Rimkus had to relocate its operation to temporary offices in Jackson, Mississippi and Lafayette, Louisiana. To staff these temporary offices, Rimkus rented out hotel rooms and apartments in Jackson and Lafayette for its New Orleans employees. In December of 2005, Rimkus was able to move into new, permanent office space in New Orleans, but at a higher rent than it had paid previously and only after paying a security deposit and the first month's rent. To recover all these costs, and other costs associated with Katrina, Rimkus filed several claims with Hartford. Hartford accepted and paid some claims, but denied the claims at issue here.

In December of 2006, Rimkus filed this suit in state court, claiming that Hartford

1. According to Hartford, Rimkus' actual revenues during the Period of Restoration were nearly four times the projected revenue for the same period. Rimkus does not dispute that the revenues substantially exceeded expectations but argues instead that the revenues were "post-storm" revenues and therefore not to be included in determining the loss. Rimkus claims that it lost all of its "pre-storm" revenue, and bases its claim on that loss.

improperly denied the claims it submitted for 1) loss of business income due to a business interruption; 2) temporary additional living expenses of employees in order for it to resume business at a temporary location; and, 3) additional rent to resume business at its new, permanent location. Rimkus has also alleged causes of action under the Texas Insurance Code for Hartford's failure to promptly pay claims and for attorneys' fees.[2] In January of 2007, Hartford properly removed this suit to federal court. Having agreed on the facts underlying the claims, but disagreeing as to the meaning of the underlying policy, the parties filed cross-motions for summary judgment.

## III. Parties' Contentions

Rimkus claims that, pursuant to its interpretation of the policy, it is entitled to recover on its claims for business interruption, temporary additional employee living expenses, and additional rent. First, Rimkus argues that it is entitled to recover for loss of "pre-storm" business income due to the business interruption under the express provisions of the policy. Second, it argues that it is entitled to recover the expenses it incurred to resume its business operations at temporary locations. Finally, Rimkus argues that it is entitled to certain expenses it incurred in securing a new business location because those expenses were incurred during the period of restoration.

Hartford claims that under the terms of the policy, it properly rejected all Rimkus' claims. First, Hartford argues that Rimkus suffered no loss of business income, but rather experienced an increase in business after the storm. Second, it argues that it properly denied Rimkus' temporary employee living expenses because Rimkus was not required to pay those expenses, but rather volunteered to pay them. Finally, it argues that it properly denied Rimkus' claim for other expenses related to securing a new business location because those expenses were incurred outside of the period of restoration.

## IV. Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)). In deciding a motion for summary judgment, a court must look to the substantive law underlying the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In cases based upon diversity, federal courts must apply the law of the forum state. *Finger Furniture Co., Inc. v. Commonwealth Ins. Co.,* 404 F.3d 312, 314 (5th Cir.2005) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Under Texas contract law, applicable here, an insurance policy that can be given only one reasonable con-

---

**2.** Rimkus originally pled a claim for breach of the duty of good faith and fair dealing, *see* Tex. Ins.Code Ann. § 541.060 (Vernon 2006), but has since withdrawn that claim.

struction must be enforced as written. *Id.* But if an "insurance policy can be given multiple reasonable interpretations, '[i]t is a settled rule that policies of insurance will be interpreted and construed liberally in favor of the insured and strictly against the insurer.'" *Tex. Indus., Inc. v. Factory Mut. Ins. Co.,* 486 F.3d 844, 846 (5th Cir. 2007) (quoting *Kelly Assocs., Ltd. v. Aetna Cas. & Sur. Co.,* 681 S.W.2d 593, 596 (Tex. 1984)). A policy provision is not ambiguous merely because the parties disagree as to the meaning of that provision. *Id.* Rather, ambiguity is a matter of law to be decided by a court. *Id.* Finally, when construing a policy, a court "'must give effect to all contractual provisions so that none will be rendered meaningless.'" *Id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003)).

## V. Analysis & Discussion

There is no dispute that Rimkus' office was damaged during Hurricane Katrina or that Katrina qualified as covered cause of loss. In addition, the parties have agreed to defer their arguments on damages until the present motions are decided. The main issue before the Court is the meaning of the Hartford policy as it relates to Rimkus' claims for business interruption, temporary employee expenses, and expenses for new office space. Additionally, the Court must determine whether Rimkus has claims under the Texas Insurance Code.

### A. *Business Interruption*

█ The policy provides coverage in the case of loss of business income "due to the necessary interruption of [Rimkus'] business operations due to direct physical loss of or direct physical damage caused by or resulting from a Covered Cause of Loss." Rimkus claims that it suffered loss of business income because it lost revenues from its regular, "pre-storm" clientele. Hartford claims that Rimkus suffered no loss of business income that would trigger coverage.

Rimkus' argument rests largely on its distinction between "pre-storm" and "post-storm" revenue sources. Essentially, Rimkus argues that it suffered a loss of business income because it has lost all of the business it had normally conducted with its customers before Katrina hit New Orleans—its "pre-storm" business. In an affidavit submitted by its Chief Financial Officer, Rimkus claims that before Katrina its New Orleans business "consisted of accident reconstruction, products liability analysis, safety analyses associated with premises liability, analyses of environmental problems, engineering analyses associated with commercial and residential buildings damaged by fire and other perils, and testimony required by this work." Rimkus further claims, "the income from this pre-Katrina business virtually disappeared following the storm and has not yet recovered to its pre-storm level of earnings, and may not do so for some time, if ever."

Hartford argues that the distinction between "pre-storm" and "post-storm" income is meaningless. Hartford points out that Rimkus continued to provide engineering and consulting services in the same industry both before and after Katrina. It also notes, without dispute, that Rimkus experienced a significant growth in income from those services after Katrina.

To Rimkus, Hartford improperly denied its claim for the loss of "pre-storm" business income because Hartford improperly counted its "post-storm" business income. Rimkus explains that while the policy provision specifying how "Business Income" is to be calculated allows Hartford to not include "[i]ncome that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact

of the Covered Cause of Loss," it is silent as to deducting income actually earned as a result of favorable business conditions and; therefore, Hartford improperly considered those actual earnings in concluding that Rimkus suffered no actual loss.

Rimkus misconstrues the "Business Income" provision. That provision does not attempt to define "Business Income" in the context of determining whether an actual loss occurred, but is intended to explain what factors will be used to determine the total payout in the event of a qualifying loss. Essentially, Rimkus attempts to put the cart (amount paid) before the horse (qualifying loss), or perhaps more accurately, it attempts to call the cart a horse.

In support of its position, Rimkus cites, among other cases, *Levitz Furniture Corp. v. Houston Cas. Co.,* No. 96–1790, 1997 WL 218256, 1997 U.S. Dist. Lexis 5883 (E.D.La. Apr. 28, 1997). In *Levitz Furniture,* the insured was forced to close its store as a result of flooding. The flood water damaged the insured's building and totally destroyed its inventory. After closing its doors for a period of 67 days, the insured reopened and experienced strong sales because the flood created demands for furniture. The insured, claiming that it was unable to take advantage of the favorable market conditions for furniture, argued that it was entitled to a recovery based upon the improved market conditions. The court agreed, finding that the policy language provided that the amount of loss was to be determined based upon the experience of the business before the interruption and "the [p]robable experience thereafter … that would have existed had no interruption of production or suspension of business operations or services occurred."

However, *Levitz Furniture* is not on point. In that case, the insured experienced a shut down of business operations for two months. Moreover, the insurer tried to deduct amounts earned by the insured after the business interruption had ceased and the insurer had resumed normal business operations. Finally, the insured submitted a claim for income that was never realized. In the present case, Rimkus continued to operate and earn income through its temporary offices, and Hartford has not argued that income earned after Rimkus resumed normal business operations (the income earned after Rimkus moved into its new office space) should be deducted from the amount payable. Instead, Hartford argues that no interruption occurred because Rimkus continued to provide engineering and consulting services. To support its position, Rimkus invites the Court to accept that there is a meaningful distinction between "pre-storm" business and "post-storm" business—an invitation the Court is unwilling to accept. Finally, the *Levitz Furniture* court suggests that business interruption equates to business stoppage, something that did not occur in the present case. While the *Levitz Furniture* court noted that the period of interruption is not necessarily equal to the set number of days a business is closed, it is clear that "business interruption" means "business stoppage"—which did not occur here. The record clearly indicates that Rimkus continued to provide its services in the aftermath of Katrina.

■ Because Rimkus suffered no business income loss, coverage under the policy was never triggered. Furthermore, Hartford contends that even if coverage was triggered, it was permitted to reduce the amount it paid Rimkus "to [the] extent that the reduction in volume of business income from the affected channel is offset by an increase in the volume of business from other income channels." Rimkus argues that this reduction provision is ambiguous because the term "income chan-

nels" is undefined, that the policy should be construed against the insurer, and that if enforced, the reduction provision would cause coverage to be largely illusory. Hartford counters that the reduction provision can be given a plain and ordinary meaning, merely because a term is not defined does not make it ambiguous, and that enforcement does not make coverage illusory.

The reduction provision is found in the section entitled "Reduction in Amount We Pay." The import of that section is that Hartford is allowed to reduce its payout for business income loss to the extent that Rimkus is able to resume business operations or to earn income from another source. In particular, the provision allows Hartford to reduce payment for loss of business income by the amount that Rimkus is able to recoup from other "income channels."

■ While a provision in an insurance policy is construed against the insurer if it is ambiguous, a provision that is not ambiguous is construed as written. *Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 551 (5th Cir.2000). The absence of a definition does not render a term ambiguous. *Id.* at 551 n. 3. The reduction provision is not ambiguous; its plain language indicates that Hartford can reduce what it pays out for loss of business income by whatever business income is generated from other "income channels." Here, even accepting Rimkus' distinction between "pre-storm" business and "post-storm" business, Rimkus clearly experienced an increase in business volume from other income channels—its "post-storm" business—that more than offset any decline it had in "pre-storm" business income.

■ Rimkus also argues that even if the reduction provision is unambiguous it should not be enforced, otherwise the policy would offer only illusory coverage be-cause the reduction provision would allow Hartford to reduce payment for increases in sales at other offices or for fortuitous events (such as finding money in a wall that collapsed) that resulted from the covered cause. Reading the provision in the context of the entire policy, however, it is clear that the offset pertains to income generated at the location for which loss is claimed. In other words, contrary to Rimkus' argument, the offset provision would not allow Hartford to deduct from the amount it pays the increased revenues realized at Rimkus' Houston office or any amounts (found or otherwise) that did not derive from business income. Because it is clear from the pleadings and summary judgment evidence that the offsetting revenues from income were generated by the staff of the New Orleans office—the affected site, the payment reduction provision applies.

■ Rimkus also argues that the reduction provision should not be enforced be-cause the "Business Income" loss provision is more specific than the general reduction provision. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex.1994) (holding that specific provisions in an insurance policy control over general provisions). It argues that the loss provision is more specific because it states what factors will be used to determine what its business income loss will be based upon; whereas the reduction provision only generally refers to "other income channels." Rimkus contends that because actual earned income is not a factor listed, Hartford could not include earned income in determining whether an actual loss occurred. It also contends that had Hartford desired to exclude actual earned income in the business income loss provision, it easily could have done so.

Hartford argues that business income loss provision is inapplicable, and necessar-

ily not more specific, because it makes no mention whatsoever of actual earned income—as Rimkus acknowledges. Instead, Hartford contends, the reduction provision is the more specific because it actually contains language directed at "business from other income channels." Moreover, it argues that Rimkus' reading would violate the "long-established rule that 'no one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'" *Id.* at 134 (quoting *Guardian Trust Co. v. Bauereisen,* 132 Tex. 396, 121 S.W.2d 579, 583 (Tex.1938)).

In the policy, the business income provision and reduction provision are grouped together in a section entitled "Loss Conditions." When read as a whole, it is clear that the section is intended to set out the method of calculating the amount Hartford is to pay Rimkus in the event of an actual business income loss. Because it specifically applies to business earned "from other income channels"—whereas the business income provision does not—the reduction provision controls. According to the policy's terms, the amount to be paid out is equal to business income loss (taking into consideration net income before the storm and the likely net income if no interruption had occurred) less the amount of income earned from other sources. Because it earned more income from "post-storm" business than it lost in "pre-storm" business, Rimkus is not entitled to any payment for loss of business income.

Finally, in support of its position, Rimkus relies on *Finger Furniture Co., Inc. v. Commonwealth Ins. Co.,* 404 F.3d 312 (5th Cir.2005). In *Finger Furniture,* the insured had an insurance policy that covered, among other things, loss of income due to a business interruption. In June of 2001, Finger Furniture was forced to close its stores due to the flooding caused by Tropical Storm Allison. *Id.* at 313. Finger Furniture made no sales whatsoever on June 9, 2001; made limited sales on June 10; and, made strong sales the following weekend, June 16–17, because it "slashed its prices." *Id.* Finger Furniture filed a claim under its business-interruption provision, which the insurer denied. The insurer denied the claims arguing that the June 16–17 sales offset the losses that Finger Furniture had when it closed its stores on June 9. The Fifth Circuit Court of Appeals rejected the insurer's argument because "the business-loss provision [said] nothing about taking into account actual post-damage sales to determine what the insured would have experienced had the storm not occurred." *Id.* at 314. The court also found that "[n]o evidence indicate[d] that any of the sales expected for June 9–10, 2001 were made up on June 16–17, 2001." *Id.* at 314–15.

Rimkus' reliance is misplaced. In *Finger Furniture,* the insured actually closed its doors during the time for which it sought recovery—it made no sales at all on one of the days and only "opened it stores at various times" on the next. In contrast, Rimkus operated its business during the period of time for which it seeks recovery. The fact that its business income was from "post-storm" clientele is of no moment. Rimkus suffered no business income loss because its operations, the provision of engineering and consulting services, continued after Katrina and it received income for those services. Because the clear terms of the policy require "actual loss of Business Income," Hartford properly denied Rimkus' claim.

In sum, Hartford properly denied Rimkus' claim for business interruption losses because Rimkus suffered no actual loss that triggered coverage. Even if such coverage was triggered, the amount of "pre-storm" business income loss was properly

offset by income generated by "post-storm" business operations, which indisputably exceeded any loss of "pre-storm" business income. Rimkus' argument is also belied by its claims for extra expenses, i.e., for those costs associated with resuming its operations in order to "[a]void or minimize the interruption of business."

### B. Extra Expenses for Employee Housing

██ Rimkus is on more solid footing with respect to its claim for expenses incurred to staff and operate its temporary offices in Jackson and Lafayette. The policy states that Hartford "will pay Extra Expenses ... to [a]void or minimize the interruption of business and to continue business operations at the insured premises or at temporary locations."

Hartford argues that it properly rejected Rimkus' claim because Rimkus paid the hotel and apartment expenses as a gratuity or undertook those expenses on a voluntary basis; in other words, that such expenses were not necessary. Hartford also argues that the temporary expenses were "incurred by [Rimkus'] employees by reason of the damage allegedly sustained at the employees' personal residences," and not as a result of damages to Rimkus' New Orleans office.

In support of its position, Hartford relies on *Chatham Corp. v. Dann Ins.*, 351 Ill.App.3d 353, 285 Ill.Dec. 663, 812 N.E.2d 483 (2004). In *Chatham Corp.*, the insured suffered a business interruption when one of its covered facilities exploded. *Id.* at 486. The insured moved its operation to a temporary facility in order to resume its business of sterilizing medical equipment. The insured was contractually bound to pay for shipping of medical equipment from its customers to its temporary facility, but was not contractually bound to pay shipping of the sterilized

medical equipment from its temporary location to its customers' clients. To keep one of its largest customers, the insured agreed to pay the costs of shipping equipment from its temporary facility to that customer's clients. The insured submitted a claim under its business interruption policy for those expenses. The court held that the policy language limited extra expenses to necessary expenses incurred during the period of restoration and did not include "expenses that the insureds may have wanted to incur on a gratuitous or voluntary basis." *Id.* at 488–89. Because the insured "never became liable or subject to the expense of [its customer's] outbound freight" under their contract, the court found that the expenses were not necessary expenses subject to reimbursement under the policy. *Id.*

Hartford's argument misses the mark. Unlike the gratuitous expenses in *Chatham Corp.*, the hotel and apartment expenses that Rimkus paid were the necessary expenses of staffing the temporary offices located in Lafayette, Louisiana and Jackson, Mississippi—each of which are at least two hours from New Orleans. The temporary offices were established so that Rimkus could "[a]void or minimize the interruption of business and to continue business operations ... at temporary locations." Given that Rimkus was able to provide engineering and consulting services in excess of its projections, it is clear that Rimkus incurred these expenses in order to resume business operations, not because of the damage to the employees' homes. Because the unambiguous terms of the policy state that it will pay such "Extra Expense," Hartford improperly denied the claims related to temporary housing and Rimkus is entitled to summary judgment on these expenses.

### C. Additional Expenses

██ Rimkus also claims that Hartford improperly denied its claim for expenses in

securing new, permanent office space in New Orleans. Rimkus argues that it is entitled to recover the amount of additional rent (the amount that exceeded what it had paid in rent before Katrina) for its new office space.[3] Rimkus justifies this claim by noting that the lease was signed during the period of restoration—in that period of time before it moved into the new office space. Finally, Rimkus argues that because Hartford paid moving expenses, it should also pay the increased rent.

Hartford counters that the policy covers only extra expenses incurred during the period of restoration, and because the additional rent obligation arises after that period, it is not covered by the policy. It argues that Rimkus' interpretation is not a reasonable interpretation of the policy because it would allow an insured to "sign a 30–year lease for the top floor of any premier downtown building at the insurer's expense." (Def.'s Resp. to Pl.'s Mot. for Summ. J. at 17.)

An examination of the policy reveals that it provides coverage for extra expenses incurred during the period of restoration, the time between the occurrence of the covered cause of loss and the date upon which business is resumed at a new permanent location. There is no dispute that Rimkus moved into its new office spaces in December of 2005, which terminated the period of restoration and Hartford's liability for extra expenses. Rimkus, however, argues that it incurred the expense for additional rent when it signed the lease, which was before it moved into its new space. A plain reading of the extra expense provision as a whole, however, "saps" the foundation of Rimkus' position. Under the policy, it is clear that Hartford is liable for extra expenses in-

curred to "[a]void or minimize interruption of business" and that the extra expense provision is designed to cover the insured for temporary expenses related to continued business operations. The additional rental obligation for which Rimkus seeks reimbursement is not related to such temporary expenses but is rather a permanent expense of its new, permanent location. As such, Hartford is not liable for the increased rent of Rimkus' new office space.

In addition to its claims under the policy, Rimkus has made claims under the Texas Insurance Code. It first claims that Hartford violated the Texas Insurance Code by failing to promptly pay its claims. Tex. Ins.Code Ann. § 542.058 (Vernon 2006). Second, it argues that it is entitled to attorneys' fees and statutory damages at a rate of 18 percent per annum on its successful claims. § 542.060. Hartford argues only that Rimkus is not entitled to such damages because Rimkus has not successfully shown that it has any valid claims.

Because Rimkus is entitled to recover expenses related to its temporary business operations—the hotel and apartment expenses, it is entitled to recover on a limited basis the statutory attorneys' fees imposed by the Texas Insurance Code plus interest. Thus, Rimkus is entitled to summary judgment on those claims.

## VI. Conclusion

Rimkus has not shown that it is entitled to recover on its claims for business income loss or for additional rental expenses under the Hartford policy; thus, its motion for summary judgment on those claims is denied. However, because it has shown that it is entitled to recover expenses related to temporary operation of its business

---

**3.** Rimkus mentions that it also incurred expenses for the security deposit and first month's rent that it paid when it executed the

lease, but does not argue that it is entitled to recover those costs.

648

and for attorneys' fees and interest under the Texas Insurance Code, its motion for summary judgment on those claims is granted and the issue of damages remains for trial. Likewise, because Hartford has failed to show that it properly denied Rimkus' claims for extra expenses, its motion for summary judgment fails on those claims. Hartford's motion is granted, however, as to Rimkus' claims for business income loss and for additional rent.

It is so Ordered.